SYSTEMS MATERIAL HANDLING COMPANY, a Kansas Corporation, Plaintiff,

v.

Steven L. GREENSTEIN, Defendant.

Steven L. Greenstein, Plaintiff,

v.

Systems Material Handling Company, a Kansas Corporation, Defendant.

Nos. Civ.A. 98–2578–KHV, Civ.A. 99–2150–KHV.

United States District Court, D. Kansas.

Feb. 8, 2000.

---

### *MEMORANDUM AND ORDER*

VRATIL, District Judge.

Steven L. Greenstein filed this action in state court in Massachusetts, asserting claims arising from an alleged contract with Systems Material Handling Company (SMH), his former employer. SMH removed the case to the United States District Court for the District of Massachusetts, which transferred it to. this Court. This Court then consolidated it with *Systems Material Handling Company v. Steven L. Greenstein,* Case No. 98–2578–KHV, in which SMH sought to prevent Greenstein from competing or disclosing confidential information in violation of his Employment Agreement, and to clarify its rights and duties under the Employment Agreement.

Greenstein seeks damages for breach of an oral agreement, breach of an implied covenant of good faith and fair dealing, wrongful termination in violation of public policy, and violation of Massachusetts statutory law regarding payment of salary, wages and commissions.

This matter comes before the Court on *Greenstein's Motion For Partial Summary Judgment* (Doc. # 41) and the *Motion of Systems Material Handling Company for Summary Judgment* (Doc. # 43), both filed December 17, 1999. The motions address only the claims of Greenstein, and the Court shall refer to him throughout this order as "plaintiff" or Greenstein. For the reasons set forth below, the Court finds that defendant's motion should be sustained in part and overruled in part, and that Greenstein's motion for partial summary judgment should be overruled. Greenstein's claim in Count IV under Massachusetts statutory law (Case No. 99–2150) as well as all of SMH's claims in Case No. 98–2570 remain for trial.

### *Summary Judgment Standards*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

In considering a summary judgment motion the Court must view the evidence in the. light most favorable to the nonmoving party. *Tom v. First Am. Credit Union,* 151 F.3d 1289, 1291 (10th Cir.1998). Summary judgment may be granted, however, if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. Thus, " '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' summary judgment in favor of the moving party is proper." *Thomas v. IBM,* 48 F.3d 478, 484 (10th Cir.1995) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### Facts

The following facts are undisputed or, where controverted, are set forth alternately in the light most favorable to each party.

SMH, a Kansas corporation, manufactures and distributes parts, components and products for equipment, battery and telecommunications industries. In early 1996, Robert F. Gawlik, SMH president, interviewed Steven Greenstein in Kansas for a position as Eastern Regional Sales Manager. SMH hired Greenstein for the position on March 11, 1996. The parties entered into an Employment Agreement which provided a term of employment from March 11, 1996, through March 28, 1998, unless extended or terminated by mutual agreement of the parties prior to the termination date. *See Memorandum In Support Of Systems Material Handling Company's Motion For Summary Judgment,* (Doc. # 44) Ex. C. Greenstein points to evidence that the parties later extended the Employment Agreement to April of 1998. The Employment Agreement contained a Confidentiality Agreement and Non–Competition Agreement. It provided a weekly base salary of $1,250 plus benefits, and a quarterly cash bonus of $2,375. It also obligated SMH to pay Greenstein a monthly commission of 1.5 per cent of gross sales over $54,000 per month, which the parties agreed to renegotiate after Greenstein's first year of employment. The agreement provided that it would be governed and construed by the laws of Kansas. *See* Doc. # 47 Ex. G, ¶ 10. Greenstein was the only SMH salesperson with a written employment agreement.

In April 1997, Greenstein traveled to Kansas for meetings at SMH, and the parties modified the Employment Agreement to provide a monthly commission base of $120,000 effective May 1997. The modification provided that this new commission would be enforceable through April 30, 1998.

Greenstein is a citizen and resident of Massachusetts. As Eastern Regional Sales Manager for SMH, he sold SMH products to customers in several eastern states, including Massachusetts. He sold products to SMH's largest customer, Manage, Inc., a Massachusetts corporation.

In the spring of 1998, Greenstein met with Gawlik in Kansas to discuss a new employment agreement. The parties present different versions of the facts which concern the ultimate result of these negotiations. SMH points to evidence that in mid-April of 1998, the parties came to an oral understanding on some terms of a potential new employment agreement which would continue Greenstein's employment through March 31, 2000. SMH provides further evidence that the parties specifically understood that their oral understanding was not enforceable until reduced to writing. *See SMH Memorandum In Support,* (Doc. # 44) Ex. A at 119–20. Although the parties exchanged several proposals for a new contract, they never agreed on several material provisions. *Id.,* Ex. A at 121–22. Specifically, after the negotiations on April 15, SMH forwarded a proposed agreement to Greenstein. *See* Gawlik Affidavit, Ex. 1. Greenstein rejected the draft and on April 22, 1998, he sent Gawlik a memorandum. In the memorandum, Greenstein took issue with two items in the proposed agreement, including territory adjustments and the fact that house accounts were exempted from gross sales, and a provision that "SMH may terminate this Agreement upon written notice." Greenstein then sent his own proposed employment agreement to SMH. *See* Doc. # 47, Ex. E. The parties continued to negotiate, and Greenstein and Gawlik spoke on the phone several times. At his deposition, Greenstein testified that he understood that both parties contemplated that they would reach a written contract signed by both parties.

Greenstein contends that the parties reached an oral agreement. His summary judgment materials cite evidence that the

parties did not agree that the oral agreement had to be reduced to writing before it became enforceable. *See id.,* Ex. A. at 75, Ex. 7; *Greenstein's Memorandum In Opposition to Systems Material Handling Company's Motion For Summary Judgment* (Doc. # 7), Greenstein Affidavit; *Greenstein Motion For Partial Summary Judgment,* Greenstein Affidavit. Greenstein also provides evidence that by its terms the new oral agreement terminated on March 31, 2000, or sooner as provided in the employment agreement. He contends that SMH agreed that if it terminated his employment before March 31, 2000, it would pay him six months compensation and benefits. *See Greenstein's Memorandum In Opposition To System Materials Handling Company's Motion For Summary Judgment* (Doc. # 45), filed January 7, 2000, Greenstein affidavit (January 5, 2000) ¶ 6. He also asserts that a "proposed" version of the agreement provided that SMH could terminate the agreement before March 2000 if Greenstein committed a felony or was incarcerated. Gawlik testified that SMH sent an agreement to Greenstein based on their "understanding." *See SMH Memorandum In Support* (Doc. # 44), Ex. 7, 21. Greenstein contends that the new employment agreement provided for a weekly salary of $1,336.55, and points to uncontroverted evidence that beginning with the April 24, 1998 payroll, SMH paid him that higher salary.

The parties agree that they never signed a written contract which extended Greenstein's employment. Greenstein asserts, however, that the terms of a new Employment Agreement are evidence in two unsigned written drafts of an Employment Agreement. *See id.* Exs. 7, 21.

The original employment agreement expired either on March 28, 1998 (as alleged by SMH) or at the end of April of 1998 (as alleged by Greenstein), but Greenstein continued to work as Eastern Regional Sales Manager, without a written contract, after that date. On June 15, 1998, SMH notified Greenstein in Massachusetts that it was terminating his employment.

During the last three months on the job, Greenstein's sales were increasing. From March through June of 1998, his sales exceeded $200,000 a month. In May, Greenstein had his highest monthly sales figure. Gawlik testified that before SMH terminated his employment, Greenstein was a good salesman, had good relationships with SMH accounts, and increased SMH sales.

Before his termination, Greenstein secured two "blanket purchase orders" for Manage, Inc., one of SMH's largest customers, for a sales extending through December, 1998. Greenstein asserts that under company policy, he was entitled to a commission on these sales. SMH asserts that it distinguishes the final sale of a product under a "blanket purchase order" and the origination of that order, because a customer can reschedule, alter or cancel an order. Greenstein counters with evidence that an SMH sales manager gave deposition testimony that he was not aware of any occasion on which Manage (or East Penn, another customer) had cancelled a purchase order. Greenstein points to evidence that a commission from SMH is ordinarily payable when a customer places an order unless the customer does not pay for a shipment, in which case SMH does not pay the commission.

SMH produced evidence that after it terminated Greenstein, it paid him all compensation, commissions and bonuses due under the terms of the expired Employment Agreement, and those which Greenstein had earned under the oral understanding concerning the new commission structure. Greenstein counters with evidence that SMH has failed to pay him commissions for purchase orders which he originated, where shipment occurred after his departure. He points to evidence that between July and September of 1998, SMH invoiced more than $400,000 in shipments to Manage. *See Greenstein Memo in Opposition,* Ex. 5. Greenstein also testified that he procured purchase orders for other customers, including East Penn, EZ

Go, Raymond, Brand–Rex, Mercury Wire & Cable, and Bumper Boat. SMH has not paid any commissions to any employee who handled Greenstein's former territory.

### Analysis

#### I. Choice Of Law Rules

Preliminarily, the Court must address a choice of law question. SMH asserts that whether the Court applies the choice of law rules of Kansas or Massachusetts, the substantive law of Kansas is controlling. Greenstein counters that the Court must apply Massachusetts choice of law rules and that the substantive law of Massachusetts is governing.[1]

■■■■ Greenstein originally filed suit in Massachusetts state court. SMH removed the case to the United States District Court for the District of Massachusetts, which transferred it to this Court at the request of SMH under 28 U.S.C. § 1404(a). Generally, a federal trial court sitting in diversity applies the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477, (1941); *TPLC, Inc. v. United Nat'l Ins. Co.*, 44 F.3d 1484, 1490 (10th Cir.1995). Where a case is transferred from one forum to another under Section 1404(a), however, a transferee court must follow the choice of law rules of the transferor court. *Van Dusen v. Barrack*, 376 U.S. 612, 635–37, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). The Tenth Circuit, however, has adopted an "exception to this exception" where the case has been transferred but the transferor court lacked personal jurisdiction over defendant, the choice of law rules of the transferee court will apply. *Trierweiler v. Croxton and Trench Holding Corp.*, 90 F.3d 1523, 1532 (10th Cir.1996) (citing *Davis v. Louisiana State Univ.*, 876 F.2d 412, 414 (5th Cir.1989) (per curiam); *Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 967 (9th Cir.1993)). "This is so even when the case was transferred under 28 U.S.C. § 1404(a)—purportedly for conve-

nience—rather than 28 U.S.C. § 1406(a)—for improper venue—so long as the transfer did in fact cure a jurisdictional defect." *Id.*, citing *Davis*, 876 F.2d at 414; *Muldoon*, 1 F.3d at 967. This rule discourages forum-shopping because it prevents a party from filing in a district which lacks jurisdiction to hear the case, in order to receive the benefit of the law of that forum.

■■■■ Under this rule, in order to determine which state's choice of law rules apply, the Court must first determine whether Massachusetts had personal jurisdiction over defendant. In diversity cases, federal courts have personal jurisdiction as permitted by state law, consistent with the due process requirement of the Fourteenth Amendment. *Dobbs v. Chevron U.S.A., Inc.*, 39 F.3d 1064, 1067 (10th Cir.1994). The long-arm statutes of Massachusetts have been interpreted as exercising the broadest grant of jurisdiction consistent with constitutional due process requirements. *Good Hope Indus., Inc. v. Ryder Scott Co.*, 378 Mass. 1, 5–6, 389 N.E.2d 76; *Heins v. Wilhelm Loh Wetzlar Optical Mach. GmbH & Co. KG.*, 26 Mass.App.Ct. 14, 16, 522 N.E.2d 989 (1988). "[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95, (1945) (quotations omitted). The "minimum contacts" standard of *International Shoe* may be met in one of two ways. Specific jurisdiction—based on a matter occurring in the forum state—exists when defendant "purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its

---

**1.** Each party takes the alternative position that no matter what substantive law applies, that party is entitled to prevail. The Court

briefly addresses these arguments in the appropriate sections dealing with each of plaintiff's claims.

laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). On the other hand, if a party has continuous and systematic conduct within a state, the state has general personal jurisdiction over it. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (general jurisdiction arises when foreign corporation's contacts with forum state are "continuous and systematic"). In order for general jurisdiction to lie, a foreign corporation must have a substantial amount of contacts with the forum state. In assessing contacts with a forum, courts consider (1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state, through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation. 4 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure at § 1069, at 348–55 (2d ed.1987). In this case, Greenstein has presented uncontroverted evidence that through him, SMH solicited business in Massachusetts; that SMH sent him, as its agent, to set up a regional office in his home in Massachusetts; that SMH registered as a Massachusetts employer; and that SMH did a substantial amount of business in Massachusetts. Based on these facts, the Court finds as a matter of law that Massachusetts had general personal jurisdiction over SMH.

In the alternative, to establish minimum contacts on a theory of specific jurisdiction, plaintiff must first demonstrate that his cause of action "arises out of, or relates to" defendant's contacts with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Plaintiff must then demonstrate that defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Finally, defendant may avoid jurisdiction if it can establish that allowing the suit to go forward would be inconsistent with "fair play and substantial justice." *International Shoe,* 326 U.S. at 320, 66 S.Ct. 154. Greenstein has demonstrated that his cause of action arises out of his dealings with SMH, as its agent, in Massachusetts. Further, SMH asked plaintiff to set up a regional office in Massachusetts and thus purposefully availed itself of the privilege of conducting activities in the state. Notions of fair play and substantial justice are not offended by a requirement that SMH defend itself in a Massachusetts forum.

Because Massachusetts has general and specific personal jurisdiction over SMH, Massachusetts choice of law rules apply to Greenstein's claims against SMH. In its reply brief, however, SMH notes that Kansas choice of laws rules apply to its claims—which seek to enforce the Confidentiality and Non–Competition provisions of the original Employment Agreement—and that each party has an equal interest in the application of the substantive law of the party's own forum state. *See Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 135 F.3d 750, 752 (11th Cir.1998). SMH contends that because the cases are consolidated, however, the Court must choose to apply the substantive law of *one* state. Although at least one circuit has held that courts should apply a balancing of interests to choose which law to apply in a consolidated case, *see Boardman Petroleum, Inc.* 135 F.3d 750, 752, the Court need not reach this issue unless *of necessity* the law of only one state may be applied. Although the parties' competing claims arise out of the same employee-employer relationship, it does not automatically follow that the Court must apply the substantive law of only one state to all claims. In this case, the SMH claims arise from the parties' original written Employment Agreement, while plaintiff's claims arise out of an alleged second oral agreement and under theories of implied covenants, public policy and Massachusetts

statutory law. Thus the Court need not apply the substantive law of only one state. The Court therefore applies the choice of law rules of Massachusetts to plaintiff's claims.

Massachusetts follows a "functional choice-of-law approach [to contract cases] that responds to the interests of the parties, the States involved, and the interstate system as a whole."[2] *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662, 668 (1985). Consequently, the Court applies the substantive law of the state with "the strongest interest in the resolution of the particular issue presented." *Schulhof v. Northeast Cellulose, Inc.*, 545 F.Supp. 1200, 1203 (D.Mass.1982) (further quotations omitted). The Massachusetts Supreme Judicial Court determines a state's interest by weighing several factors:

> (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

*Bushkin*, 393 Mass. at 632, 473 N.E.2d 662 (quoting Restatement (Second) of Conflict of Laws (1971), § 188(2)). The test is qualitative rather than quantitative; the Court must not simply add the factors together but must weigh them, considering also:

> (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.

*Id.*, 393 Mass. at 632, 473 N.E.2d 662 (quoting Restatement (Second) of Conflict of Laws, (1971) § 6(2)). Having balanced all of the factors, a court should choose "that law 'which would carry out and validate the transaction in accordance with [the] intention [of the parties].'" *Id.* at 636, 473 N.E.2d 662 (quoting *Boston Safe Deposit & Trust Co. v. Paris*, 15 Mass. App.Ct. 686, 691, 447 N.E.2d 1268, 1270 (1983)); *see Continental Bank, N.A. v. Village of Ludlow*, 777 F.Supp. 92, 99 (D.Mass.1991).

The choice of law analysis requires the Court to first ascertain the particular substantive law of the states in question. If the state laws differ so as to affect the outcome, only then must the Court determine which state has the stronger interest in the resolution of the particular issue presented.

## II. Breach of oral contract

 In his first count Greenstein alleges that SMH breached an oral contract to employ him for two years, until March 31, 2000, at a salary of $1,336.55, with commission and bonuses. SMH asserts that the undisputed evidence shows that the parties never reached an agreement and, in the alternative, that the Kansas and Massachusetts statutes of frauds bar plaintiff's claim for breach of contract.[3] Plaintiff asserts that he has presented facts which

---

2. In adopting the functional approach, the Massachusetts Supreme Judicial Court stated: we decide here not to tie Massachusetts conflicts law to any specific choice-of-law doctrine, but seek instead a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole.... Our approach, however, while producing less predictability, rejects artificial constructions. This, after all, was the primary reason for rejecting the traditional lex loci

approach in favor of more modern methods. It makes little sense to reject one artificial approach only to replace it with another.
*Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 668 (1985).

3. SMH contends that under Kansas law, absent an enforceable contract, Greenstein was an at-will employee and thus not entitled to any alleged salary, bonus or severance pay after termination.

support his oral contract claim and that under either Massachusetts or Kansas law, the contract is enforceable under certain exceptions to the statutes of frauds.

In its initial summary judgment brief, SMH does not deny that the parties reached an *oral understanding* to extend plaintiff's employment for two years pending execution of a written contract. SMH argues that it is entitled to summary judgment, however, because on this record it is undisputed that the parties did not agree upon several material provisions, and they intended that the agreement would not be enforceable until executed in writing. The record contains evidence, including testimony and documents, which demonstrates that the parties exchanged written draft agreements and made proposals and counter proposals, yet never reached or signed a complete agreement. Greenstein attempts to create a factual issue whether the parties came to an oral agreement, relying in part on testimony that he and SMH reached an "understanding" on the two year extension and evidence that SMH began paying him a higher salary after the initial contract term expired. Greenstein points to his own affidavit, which states that the parties agreed that he would receive six months compensation if SMH terminated him (without cause) before March 2000. *See Greenstein's Memorandum In Opposition To System Materials Handling Company's Motion For Summary Judgment* (Doc. # 45), filed January 7, 2000, Greenstein affidavit (January 5, 2000) ¶ 6. In his deposition, however, Greenstein testified that on April 15, 1998 he and Gawlik agreed that SMH would employ him for two years at a specified salary; that Gawlik later tried to add terms to which plaintiff had not agreed; and that around April 21, 1998 plaintiff sent Gawlik a memorandum which asked him to remove those terms from the proposed agreement. *See* Greenstein Deposition, at 98–100. Greenstein testified that he also discussed the matter with Gawlik several times, on the telephone. He testified that Gawlik eventually agreed to not pull any accounts, but that Gawlik would

not change his position on a term that SMH could fire him at will: "He said he was unwillingly to move on [this item], that as far as he was concerned, he could terminate anybody at anytime and it was his company." *Id.* at 105. Greenstein further testified as follows:

A: ... He was willing to offer me some sort of severance, and he talked about 90 days, I believe, initially. Then he talked about six months at some point but was unwilling to make a firm commitment, kind of testing the waters with me. And when I was unwilling to jump on anything he said as accepting it, he called me a "greedy Jew."

Q: Okay. Anything else?

A: And I suggested, I said, "Bob, look. This is a really sticky point at this point, and you're really angry, and I don't think we're best served discussing this any further today. Maybe we should have both of our attorneys talk and just come up with something reasonable, and if they can agree to something, then it's a done deal."

And he did not want to do that, and he agreed that we weren't going to come to any agreement in that conversation, so we ended the conversation. And I don't remember if he said to me to call me back again or if he called me again, but we did speak again.

Q: Okay. What was the next conversation?

A: The next conversation, I still hadn't acquiesced to what he wanted, and he was really unwilling to move. And again he reiterated, "Just sign the fucking thing and send it back to me." And I said, "Bob, I really need to think about it."

*Id.* at 105–06. Greenstein testified that he then spoke with Pat McLaughlin, "Bob's number two guy," and Mark Friday, his supervisor, about why Gawlik was unwilling to commit to him for two years. Greenstein testified he told Friday that if he didn't work at SMH, he might become a

consultant to customers to help them purchase products like those which SMH sold. Greenstein did not speak with Gawlik again until Gawlik called to fire him. *Id.* at 107, 09–111.

Greenstein's deposition testimony clearly indicates that the parties did not agree on the terms under which SMH could terminate his employment, or on whether Greenstein would be entitled to severance and if so for how long. Greenstein attempts to contradict his deposition testimony with his affidavit, in which he states that he and Gawlik agreed that he would receive six months compensation if SMH terminated him (without cause) prior to March 2000.[4] *See Greenstein's Memorandum In Opposition To System Materials Handling Company's Motion For Summary Judgment* (Doc. # 45), filed January 7, 2000, Greenstein affidavit (January 5, 2000) ¶ 6.

In these circumstances the Court questions whether it should disregard this portion of Greenstein's affidavit on the ground that it contradicts his prior deposition testimony and is generated solely to defeat defendant's properly supported summary judgment motion. The Tenth Circuit has addressed the question of when a court should disregard an affidavit, as follows:

> There is authority for the proposition that in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements. *See* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2738, at 473–74 (2d ed.1983); 6 (Part 2) J. Moore & J. Wicker, *Moore's Federal Practice* ¶ 56.22[1], at 56–1325 to 56–1326 (1985 ed.). In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue. Underlying those decisions is the conclusion that the utility of

summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting [her] own prior testimony. Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during [her] earlier testimony, whether the affiant had access to the pertinent evidence at the time of [her] earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

*Franks v. Nimmo,* 796 F.2d 1230, 1237–38 (10th Cir.1986) (internal citations omitted) (disregarding expert's affidavit where he was carefully cross-examined in earlier depositions, expert had access to relevant evidence at that time, affidavit did not refer to earlier contrary statements, and earlier testimony was unequivocal; further, affidavit was offered only after summary judgment had been granted against him on that issue); *see Rios v. Bigler,* 67 F.3d 1543 (10th Cir.1995).

The factors set out in *Franks* support a finding that the Court should strike the relevant portion of Greenstein's affidavit. Defendant extensively examined Greenstein, who apparently made no corrections to the deposition. His affidavit does not cover newly discovered evidence, and his deposition testimony does not reveal confusion which the affidavit attempts to explain. *See Franks,* 796 F.2d at 1237–38. The statements which appear in paragraph six of Greenstein's affidavit of January 5, 2000 create sham factual issues on summary judgment. *See Greenstein's Memorandum In Opposition To System Materials Handling, Company's Motion For Summary Judgment* (Doc. # 45), filed January 7, 2000, Greenstein affidavit (January 5, 2000) ¶ 6.

---

4. The Court notes that Exhibit 7, to which Greenstein refers in his affidavit, was apparently nothing but his own counterproposal.

Perhaps the only credible evidence of an actual contract is the fact that during plaintiff's last few months on the job, SMH paid him the higher salary which allegedly went with the new agreement. Based on a review of the entire record, however, and in particular Greenstein's deposition testimony, affidavit, memorandum suggesting alternative contract terms, and the unsigned proposed written contracts, the Court simply finds that no reasonable jury could believe that the parties agreed on the material terms of a new agreement. *Cf. Augusta Bank & Trust v. Broomfield,* 231 Kan. 52, 60, 643 P.2d 100, 107–07 (1982) (question whether the parties have entered a contract depends on the intent of the parties, and intent is a question of fact for the jury); *Kinchla v. Welsh,* 8 Mass. App.Ct. 367, 370, 394 N.E.2d 978, 981 (1979) (where there is conflicting testimony on question whether contract has been created, issue is for jury).

### III. *Implied Covenant of Good Faith and Fair Dealing*

In Count II, Greenstein claims that even if the parties never reached an enforceable contract, SMH breached an implied covenant of good faith and fair dealing when it terminated his employment.[5] SMH asserts that Kansas law controls this claim, and correctly points out that Kansas courts do not recognize the implied covenant of good faith and fair dealing as an exception to the doctrine of employment at will. *See Greenlee v. Board of County Comm'rs.,* 241 Kan. 802, 740 P.2d 606, (1987); *Morriss v. Coleman Co., Inc.,* 241 Kan. 501, 738 P.2d 841 (Kan.1987).[6] Thus, if Kansas law applies, SMH is entitled to

summary judgment on this claim.[7] In contrast, Massachusetts recognizes an implied covenant of good faith and fair dealing, even in at-will contracts of employment. *See Fortune v. National Cash Register Co,* 373 Mass. 96, 364 N.E.2d 1251 (1977) (where commissions are to be paid for work performed by employee, employer's decision to terminate at-will employee should be made in good faith).[8] Greenstein has produced evidence that his termination falls within this exception for which Massachusetts courts are willing to imply a covenant of good faith and fair dealing. Greenstein has submitted evidence that he had procured purchase orders for which he was entitled to commissions. He also has pointed to evidence that he was performing very well in his job when SMH fired him. Thus a jury could infer that SMH fired him in bad faith, to avoid paying commissions on pending sales.

■ Because the outcome of defendant's summary judgment motion on plaintiff's good faith and fair dealing claim depends on the choice of Kansas or Massachusetts law, the Court must address the choice of law issue. The question is whether Kansas or Massachusetts has the most significant relationship to the issue in question, considering the factors set forth in *Bushkin Assocs., Inc. v. Raytheon Co.,* 393 Mass. 622, 631, 473 N.E.2d 662, 668 (1985).

The first factor is the place where the parties entered the contract. In this case, the parties did not execute an enforceable new contract. The parties agree that plaintiff continued to work, however, after the original agreement expired. His con-

---

5. Greenstein fails to set forth this claim in any detail.

6. Kansas courts have also rejected a cause of action for negligent performance of an employment contract. *Prost v. F.W. Woolworth Co.,* 647 F.Supp. 946 (D.Kan.1985), *aff'd,* 1986 WL 32744, (10th Cir.).

7. Greenstein does not assert a claim based on an implied-in-fact contract. Kansas courts have allowed a cause of action for breach of an implied-in-fact contract of employment.

*See, e.g., Allegri v. Providence–St. Margaret Health Center,* 9 Kan.App.2d 659, 684 P.2d 1031 (1984) (parties may become contractually obligated by their nonverbal conduct as well as by their use of oral or written words.).

8. The *Fortune* case involved a written contract but the Massachusetts courts have extended the implied covenant of good faith and fair dealing to oral contracts. *See Gram v. Liberty Mutual Ins. Co.,* 384 Mass. 659, 429 N.E.2d 21 (Mass1981).

tinued work was not pursuant to a written agreement or to any binding agreement regarding its duration, and it was therefore a contract for employment at will. The employer-employee relationship began in Kansas, when the parties entered into the original Employment Agreement. As for the second factor, the place of negotiation, the parties agree that in the spring of 1998, Greenstein met with Gawlik in Kansas to discuss a new employment agreement. They continued discussions via correspondence and telephone conversations between Greenstein, who was in Massachusetts, and Gawlik, in Kansas. Although they could not agree upon a new written agreement as to duration of employment, at some point the parties at least impliedly agreed that Greenstein would continue to work for SMH. Thus, the Court can only conclude that they entered the at-will contract in Kansas *and* Massachusetts. These first two factors combined thus favor Kansas to a slight degree.

The third factor, the place of performance, favors Massachusetts. SMH's biggest customer is in Massachusetts, and Greenstein sold SMH products in Massachusetts and other eastern states, but not in Kansas. The fourth factor, the subject matter of the contract, is a mixed bag: Greenstein worked out of a regional sales office in Massachusetts, but sold products that SMH shipped from other states. The fifth factor, the domicile, residence, place of incorporation and business of the parties, also does not point clearly to one state over the other. SMH is incorporated in Kansas, where it has its principal place of business. Greenstein, on the other hand is domiciled and resides in Massachusetts. Further, SMH hired Greenstein to establish the regional office in Massachusetts, but he sold products in many other states. Overall, these five factors suggest that Kansas has the most significant relationship with the employer-employee relationship in this case.

The Court next turns to the other factors that Massachusetts courts apply in determining which state has the most sig-

nificant relationship with the issue in question. The first factor, which concerns the needs of the interstate system, points no specific direction in this case. The second factor, the relevant policies of the forum, points to Massachusetts (which for purposes of this analysis is the forum). Massachusetts policy favors application of the covenant of good faith and fair dealing. The next factor, the relevant policies of Kansas and the relevant interest of Kansas in determining this issue, appears to favor Kansas law; Kansas has a public policy of protecting the employee-at-will principle except in very narrow and specific circumstances. The fourth factor, which addresses the justified expectations of the parties, also tips toward Kansas because the original contracts contained a Kansas choice of law clause *See Bradley v. Dean Witter Realty, Inc.*, 967 F.Supp. 19, 24 (D.Mass. 1997) (viewing choice of law provision in earlier contract as evidence of parties intent to use that state's law in subsequent separate oral contract). The fifth factor, the basic policies which underlie the field of employment law, include opposing policies of protection of the employee as well as the employer. In this case, Massachusetts protects employees more strongly, while Kansas law tends more toward protecting the interest of employers. The sixth factor, which is concerned about matters of certainty, predictability, and uniformity of result, does not appear to favor the law of either state. Finally, the ease in the determination and application of law to be applied does not favor either state; Kansas clearly does not apply the covenant of good faith and fair dealing to at-will employment contracts, while Massachusetts clearly does.

While the question is a close one, the Court finds that Kansas has the most significant relationship to the issue of a covenant of good faith and fair dealing in an at-will employment situation. *Cf. Sargent v. Tenaska, Inc.*, 914 F.Supp. 722, 726 (D.Mass.1996) (Massachusetts resident signed offer of employment in Massachusetts and established and supervised re-

gional office in Massachusetts; court found Massachusetts had most significant relationship with case). Therefore, the SMH motion for summary judgment on the implied covenant of good faith and fair dealing will be sustained.

### IV. *Wrongful Termination in Violation of Public Policy*

■ SMH next asserts that the Court must grant summary judgment on plaintiff's claim that SMH violated public policy in wrongfully terminating his employment. Greenstein alleges that SMH terminated his employment to avoid paying him bonuses, commissions and compensation for past services.

Kansas law recognizes only limited exceptions to at-will-employment.

> An employee-at-will is just that. He or she may be terminated without cause. The only exceptions thereto arise from public policy. An employee-at-will may not be terminated in retaliation for having filed a workers compensation claim, *Murphy v. City of Topeka–Shawnee County*, 6 Kan.App.2d 488, 630 P.2d 186 (1981), or for 'whistle-blowing,' *Palmer v. Brown*, 242 Kan. 893, 752 P.2d 685 (1988).

*Dickens v. Snodgrass, Dunlap & Co.*, 255 Kan. 164, 872 P.2d 252 (1994). Kansas courts have not created a public policy exception where an employer allegedly terminates an employee in order to deprive him of earned salary.[9]

Massachusetts courts are more willing than Kansas courts to impose liability for terminating at-will employees in violation of clearly established public policy. Thus, Massachusetts recognizes exceptions to the employment-at-will doctrine where an employee is fired for asserting a legally guaranteed right, *e.g.*, filing a worker's

compensation claim; for doing what the law requires, *e.g.*, serving on a jury; or for refusing to perform illegal acts, *e.g.*, committing perjury. *See Smith–Pfeffer v. Superintendent of Walter E. Fernald State School*, 404 Mass. 145, 149–50, 533 N.E.2d 1368 (1989); *Frankina v. First Nat'l Bank of Boston*, 801 F.Supp. 875, 884 (D.Mass. 1992). "Courts are hesitant, however, to create a new common law cause on action, only doing so when there is 'no other way to vindicate such public policy.'" *Frankina*, 801 F.Supp. at 884 (quoting *Melley v. Gillette Corp.*, 19 Mass.App.Ct. 511, 512, 475 N.E.2d 1227 (1985), aff'd, 397 Mass. 1004, 491 N.E.2d 252 (1986)).[10]

As with the implied covenant of good faith and fair dealing, the Court finds that Kansas law applies to the related issue whether SMH violated public policy when it terminated Greenstein. Because Kansas courts do not recognize this as an exception to the at-will employment doctrine, SMH is entitled to summary judgment on this claim.

### V. *Massachusetts State Law Claim under Mass.Gen.Law Ch. 149, Sections 148 and 150.*

Greenstein asserts a state law claim under Mass.Gen.Law Ch. 149, Sections 148 and 150. This law provides in relevant part:

> Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week, or to within seven days of the termination of the pay period during which the wages were earned if such employee is em-

---

**9.** Of course, an employee who can show that an employer has refused to pay him for work performed also has potential remedies in the form of unjust enrichment or quantum meruit, but Greenstein has not asserted claims under these theories.

**10.** Massachusetts courts would find that Greenstein has a remedy under the implied covenant of good faith and fair dealing. Further, the Court notes that to the extent defendant's failure to pay salary and commission violated the public policy embodied in Mass. Gen.Law. Ch. 149, §§ 148, 150, the statute itself provides a remedy.

ployed seven days in a calendar week, or in the case of an employee who has worked for a period of less than five days, hereinafter called a casual employee, shall, within seven days after the termination of such period, pay the wages earned by such casual employee during such period, but any employee leaving his employment shall be paid in full on the following regular pay day, and, in the absence of a regular pay day, on the following Saturday; and any employee discharged from such employment shall be paid in full on the day of his discharge, or in Boston as soon as the laws requiring pay rolls, bills and accounts to be certified shall have been complied with; ... This section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee, and commissions so determined and due such employees shall be subject to the provisions of section one hundred and fifty.

Mass.Gen.Law. Ch. 149, § 148. Under Section 150 of Mass.Gen.Law Ch. 149, "[t]he attorney general may make complaint against any person for a violation of section one hundred and forty-eight within three months after the date thereof." Mass.Gen.Law Ch. 149, § 150. Section 150 further provides:

> Any employee claiming to be aggrieved by a violation of section one hundred and forty-eight, one hundred and forty-eight B, one hundred and fifty C, one hundred and fifty-two and one hundred and fifty-two A may, at the expiration of ninety days after the filing of a complaint with the attorney general, or sooner, if the attorney general assents in writing, and within three years of such violation, institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief and any damages incurred, including treble damages for any loss of wages and other benefits. An employee so aggrieved and

who prevails in such an action shall be entitled to an award of the costs of the litigation and reasonable attorney fees.

Mass.Gen.Law. Ch. 149, § 150.

 SMH does not specifically argue that Kansas law precludes plaintiff's statutory claim under Massachusetts law. For purposes of this motion, the Court therefore assumes that plaintiff has properly invoked Massachusetts law on his wage claim, and proceeds to the SMH argument that under company policy, Greenstein is not entitled to commissions on sales completed after the date of termination. *See Weinzirl v. Wells Group, Inc.*, 234 Kan. 1016, 1021, 677 P.2d 1004, 1009 (1984). SMH cites evidence that it paid Greenstein all salary and commissions due under the Employment Agreement and the at-will employment which followed. Greenstein points to evidence that he procured purchase orders for sales that SMH ultimately consummated, however, and that his actions earned him commissions under established SMH policy. Such evidence raises a genuine issue of material fact regarding SMH's compliance with its statutory duty under Mass.Gen.Law Ch. 149, Sections 148 and 150. Therefore the Court finds that SMH's motion for summary judgment on Count IV should be denied.

**IT IS THEREFORE ORDERED** that *Greenstein's Motion For Partial Summary Judgment* (Doc. # 41) filed December 17, 1999, be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that the *Motion of Systems Material Handling Company for Summary Judgment* (Doc. # 43) (Case No. 99–2150) filed December 17, 1999, be and hereby is **OVERRULED** as to plaintiff's claims under Mass.Gen. Law Ch. 149, Sections 148 and 150 and otherwise **SUSTAINED.**

All of SMH's claims in Case No. 98–2578 remain for trial.