**Slip Op. 01-14**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: HONORABLE NICHOLAS TSOUCALAS

_____
                                          :
UNITED STATES,                            :
                                          :
        Plaintiff,                        :
                                          :
        v.                                :   Court No. 98-03-00620
                                          :
SPANISH FOODS, INC., et al.,              :
                                          :
        Defendants and                    :
                                          :
FAUSTO DIAZ-OLIVER, et al.,               :
                                          :
        Third-Party Plaintiffs,           :
                                          :
        v.                                :
                                          :
CLAUDIO L. MARTINEZ,                      :
                                          :
        Third-Party Defendant             :
_____:

[Plaintiff's motion for summary judgment is denied; defendants' cross-motion for summary judgment is denied.]

    Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; Commercial Litigation Branch, Civil Division, United States Department of Justice (James W. Poirier) for plaintiff.

    Carroll & Associates, P.A. (Linda L. Carroll) for Lilliam S. Martinez.

    Fotopulos & Spridgeon (Thomas E. Fotopulos) for Fausto Diaz-Oliver.

    Collier Shannon Scott, PLLC (Paul C. Rosenthal, John B. Brew and John M. Herrmann) for Remedios Diaz-Oliver.

    Holland & Knight LLP (Gregory Baldwin) for George Mencio, Jr.

## O R D E R

Defendants Spanish Foods, Inc., Lilliam S. Martinez, Francisco Hernandez-Perez, Fausto Diaz-Oliver, Remedios Diaz-Oliver and Vincente Hernandez-Perez ("Defendants"), being sued by the United States for civil penalties and lost duties for 158 violations of 19 U.S.C. § 1592 on March 27, 1998, had moved for summary judgment claiming that the Government commenced this action after the expiration of the five-year statute of limitations provided for in 19 U.S.C. § 1621, and the Government had filed a cross-motion for summary judgment striking defendants' statute of limitations defense contending that this action was commenced in a timely manner. See United States v. Spanish Foods, Inc., 24 CIT ___, 118 F. Supp. 2d 1293 (2000). Both motions have been denied, see id., and the trial on the issue was held on January 17 and 18, 2001.

## I.   Undisputed Facts

Spanish Foods is the United States subsidiary of a Spanish food producer. See Def.s' Pre-Trial Mem. ("Def.s' Mem.") at 2. In or around 1990, Spanish Foods entered an agreement with Juan Antonio Sirvent Selfa, S.A. ("JASS") to become the exclusive United States importer of food products exported from Spain by JASS. See id. Consequently, JASS' former United States importer, General Commodities International, Inc. ("GCI"), hired the law firm of Holland & Knight ("H&K") to proceed with a suit against JASS for

breach of contract.  <u>See id.</u>

In the course of the litigation, George Mencio ("Mencio"), a partner at H&K, subpoenaed and received documents from Spanish Foods that indicated the presence of a "double invoicing" system between Spanish Foods and JASS.  <u>See id.</u> Mencio contacted Don Zell ("Zell"), an employee of H&K, and a meeting was arranged between Mencio, Zell and Benigno Gonzalez ("Gonzalez"), an officer of GCI. <u>See id.</u> at 2-3.  During the meeting, Gonzalez pointed out some documents and a cover letter referring to these documents and translated them from Spanish into English for Zell.  <u>See id.</u>; Tr. at 52-53.  The documents and the letter suggested that Spanish Foods and its president, Lilliam Martinez ("Martinez"), were submitting false invoices to Customs.  Pl.'s Pre-Trial Br. ("Pl.'s Br.") at 4; Def.s' Mem. at 3.  Mencio and Gonzalez asked Zell to contact Customs Service ("Customs") in order to arrange a meeting between Mencio, Gonzalez and a Customs officer.

Zell called Customs officer Carelli ("Carelli") on March 24, 1993.  During this brief phone conversation, Zell asked Carelli whether Carelli would be willing to meet an unnamed client of H&K. <u>See</u> Pl.'s Br. at 6-7; Def.s' Mem. at 3-4.  Carelli agreed to the meeting and, subsequently, Mencio called Carelli setting the meeting on March 29, 1993, at the premises of H&K.  <u>See id.</u>

The meeting on March 29, 1993, was attended by Mencio,

Gonzalez, Carelli and Robin Avers, Carelli's supervisor ("Avers").

See Pl.'s Br. at 4; Def.s' Mem. at 3-4.  At the meeting, Gonzalez

provided Carelli and Avers with the double invoicing documents and

the cover letter.  See id.


## II.  Standard of Review

The Government asserts that the statute of limitations

contained in 19 U.S.C. § 1621 (1994) must be narrowly construed by

this Court in favor of the Government.  In support of this

proposition, the Government relies on Badaracco v. Commissioner of

Internal Revenue, 464 U.S. 386, 398 (1984).  The Government

misreads Badaracco and its progeny.

Badaracco addressed the application of section 6501(a) of the

Internal Revenue Code of 1954.  The statute established a general

3-year period of limitations "after the return was filed" for the

assessment of federal income taxes.  Id. at 388.  However, section

6501(c)(1) provided that if there was "a false or fraudulent return

with the intent to evade tax," the tax then could be assessed "at

any time."  Id.  In Badaracco, petitioners conceded that they had

filed fraudulent income tax returns that were later amended in a

non-fraudulent way and additional taxes were paid.  See id.  The

IRS, however, proceeded to collect penalty funds for the fraud

committed.  See id. at 389.  The Court in Badaracco held that where

a taxpayer files a false or fraudulent return, but later files a

non-fraudulent amendment, a tax may be assessed at any time because
the plain and unambiguous language of section 6501(c)(1) permits
the IRS to assess "at any time" the tax for the year in which the
taxpayer has filed "a false or fraudulent return," despite any
subsequent disclosure the taxpayer makes. Id. at 399-401. Hence,
Badaracco is not an applicable precedent to the case at bar
because, unlike § 6501(c)(1), no part of 19 U.S.C. § 1621 provides
for bringing an action "at any time." Additionally, the rationale
of Badaracco relies on cases factually and legally irrelevant to
the case at bar.[1]  In sum, the rule of statutory construction
articulated by the Badaracco Court--the principle that statutes of
limitations, sought to be applied to bar rights of the government
must be strictly construed in favor of the government--applies only
in the absence of clear congressional intent to bind the government
to the time frame articulated by the statute. See Pacific Coast
Steel Co. v. McLaughlin, 61 F.2d 73 (9th Cir. 1932).

---

[1] Specifically, the Court in Badaracco relied on: (1) Lucas v.
Pilliod Lumber Co., 281 U.S. 245, 249 (1930), which held that the
five-year period of limitations prescribed by section 277 of the
Revenue Act of 1924 did not begin to run either at the time of the
filing of a "tentative return," or at the time of the filing of a
return not verified by the proper corporate officers because the
Revenue Act of 1918 requires returns of corporations be sworn to as
specified; and (2) E.I. du Pont de Nemours & Co. v. Davis, 264 U.S.
456, 462 (1924), case holding that an action by the Director
General of Railroads to recover for a liability on behalf of the
United States is subject to no time limitation if the only
provision prescribing a period of limitation refers to "carriers"
and the Director, representing the United States, cannot be
qualified as a "carrier."

The statute at issue provides that "[n]o suit or action to recover . . . any pecuniary penalty or forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years . . . ." 19 U.S.C. § 1621 (emphasis supplied). Considering that the right to an action for a penalty or forfeiture under the Customs Law belongs exclusively to Customs, the statutory language unambiguously reveals clear congressional intent to bind the government to the five-year limitation period. Therefore, the rule of strict construction [of the statute] in favor of the government delineated in Badaracco is inapplicable to the case at bar.

## III.    Contentions of the Parties

Section 1621 of Title 19 provides that the statute of limitations begins to run at "the time when the alleged offense was discovered . . . ." 19 U.S.C. § 1621 (emphasis supplied).

The Government reads 19 U.S.C. § 1621 jointly with 19 U.S.C. § 1592 (1994), the statute providing that a fraudulent violation must be comprised of two elements: (1) "the entry of . . . merchandise into the United States by means of a material false statement;" and (2) "knowledge that the statement was false." Pl.'s Br. at 8-9. The Government, therefore, concludes that the statute of limitations did not begin to run until Customs

discovered the presence of both elements in the violation. See id. at 9-10. The Government, however, offers no explanation to what it considers to be a "discovery." The Government only asserts the following: (1) the presence of a "mere suspicion" does not amount to discovery, see id. at 11-15; (2) principles of "constructive discovery" or "constructive notice" are inconsistent with the plain reading of 19 U.S.C. § 1621, see id. at 11-14; and (3) an offense cannot be deemed to be discovered until Customs "actually discovers" the offense. See Tr. at 18. The Government connotes that the discovery occurs when Customs has enough incriminating evidence to do any of the following: (1) open a Customs investigation case; or (2) obtain a search warrant; or (3) file a complaint in court. See generally, Tr. (Pl.'s questioning of witnesses Avers and Carelli).

Therefore, the Government maintains that discovery occurred on April 6, 1993, when "Customs officially determined that there was sufficient evidence to suspect that . . . entries had been made fraudulently to warrant opening of a formal investigation." Pl.'s Br. at 10-11. Alternatively, the Government suggests that, if principles of constructive notice are applicable, discovery occurred on March 29, 1993. See id. at 15; Tr. at 37-38.

Defendants assert that discovery occurred and the statute of limitations began to run at the moment when Customs was given

enough substantive information by a reliable source to be able to discover all other evidence through the means available to Customs, including computerized searches.  See Tr. at 22-23, 28-30; see also Def.s' Mem. at 5, citing to Unites States v. Spanish Foods, Inc. ("Spanish Foods"), 24 CIT ___, 118 F. Supp. 2d 1293 (2000). Defendants maintain that under the "discovery rule" articulated in Spanish Foods, the statute of limitations began to run upon the March 24, 1993, phone call from Zell to Carelli because during the conversation Customs was given enough substantive information.  See Tr. at 27.

## IV.  Analysis

### A.   Constructive Notice

The Government asserts that "constructive notice," that is, notice of a possibility of a wrongful act, is inconsistent with the plain meaning of 19 U.S.C. § 1621.  See Pl.'s Br. at 11.

Constructive notice is defined as "information or knowledge of a fact [that] . . . could have [been] discovered. . . by proper diligence [if the party was in] . . . such situation [that] . . . cast upon [the party] the duty of inquiring . . . ."  BLACK'S LAW DICTIONARY (6th ed.) at 1062.  Nothing in this definition conflicts with the requirement of section 1621 of Title 19 that the statute of limitations is to begin to run at "the time when the alleged offense was discovered."  19 U.S.C. § 1621.  Conversely, possession

of a proper type of evidence casts the duty of inquiring. <u>See,
e.g.</u>, <u>United States v. Nussbaum</u>, 24 CIT ___, 94 F. Supp. 2d 1343
(2000). Therefore, the Government's contention (that is, the
contention that the statute of limitations began to run on April 6,
1993, when Customs was "actually" rather than "constructively" on
notice because "Customs officially determined that there was
sufficient evidence to suspect that . . . entries had been made
fraudulently to warrant opening of a formal investigation," Pl.'s
Br. at 10-11) lacks merit.[2]

## B. Discovery Rule

Citing to <u>Spanish Foods</u>, Defendants, in turn, maintain that
under the "discovery rule," the statute of limitations began to run

---

[2] Moreover, such reading eliminates the entire purpose of and logic behind the statute of limitations.

> At common law there was no fixed time for the bringing of an action. Personal actions were merely confined to the joint lifetimes of the parties. The Statute of Limitations was enacted to afford protection to defendants against defending stale claims after a reasonable period of time had elapsed during which a person of ordinary diligence would bring an action. The statutes embody an important policy of giving repose to human affairs. The primary consideration underlying such legislation is undoubtedly one of fairness to the defendant.

<u>Flanagan v. Mount Eden Gen. Hosp.</u>, 24 N.Y.2d 427, 429 (1969) (internal citations and quotations omitted).

If the Government is allowed to wait and sit on its rights, the Government would not need a single day of the five-year limitation period offered by 19 U.S.C. § 1621.

on March 24, 1993, the day of the phone call from Zell to Carelli.

See Tr. at 27.  Defendants assert that on March 24, 1993, Customs

received enough reliable substantive information to be able to

discover all other evidence through the means available to Customs,

including computerized searches.  See id. at 32-33, 502.

> The court in Spanish Foods noted the following:
>
> > Courts have construed the first clause of § 1621 to embrace the discovery rule in fraud cases, which tolls the limitations period until the time the fraud is discovered. Thus, under the discovery rule the statute of limitations is tolled until the date when the plaintiff first learns of the fraud or is sufficiently on notice as to the possibility of fraud to discover its existence with the exercise of due diligence.

24 CIT at ___, 118 F. Supp. 2d at 1297 (internal citations and

quotations omitted, emphasis supplied).


Spanish Foods did not, however, specify what constitutes being

"sufficiently on notice" for the purpose of the discovery of fraud.

The state of being sufficiently on notice for the purpose of the

discovery of fraud has been defined by case law to mean the state

at which a party comes to obtain knowledge of the fraud or such

information on the basis of which the fraud could be detected with

reasonable diligence.[3]    See, e.g., Urland v. Merrell-Dow

---

[3] Defendants try to offer a test used by the Sixth, Eighth and Ninth Circuits, see Post-Trial Br. of Remedios Diaz-Oliver ("R. Diaz-Oliver's Br.") at 18-20 (citing to United States v. $515,060.42 in United States Currency, 152 F.3d 491 (6th Cir. 1998); United States v. 318 South Third Street, Minneapolis Minnesota, 988

Pharmaceuticals, Inc., 822 F.2d 1268 (3rd Cir. 1987), Rosner v. Codata Corp., 917 F. Supp. 1009 (S.D.N.Y. 1996), Augusta Bank & Trust v. Broomfield, 643 P.2d 100 (Kan. 1982), Salem Sand & Gravel Co. v. Salem, 492 P.2d 271 (Ore. 1971). "Reasonable diligence," in turn, means "[a] fair, proper and due degree of care and activity, measured with reference to the particular circumstances; such diligence, care, or attention as might be expected from a man of ordinary prudence and activity."[4]  BLACK'S LAW DICTIONARY (6th ed.) at 457.

As the Government correctly points out, "reasonable diligence" does not imply the duty to investigate mere suspicions. See Pl.'s Br. at 12-13.  Suspicion is defined as "[t]he apprehension of something without proof or upon slight evidence . . . ."  BLACK'S LAW DICTIONARY (6th ed.) at 1447 (emphasis supplied).  Therefore, the issue is when Customs came in possession of information or

---

F.2d 822 (8th Cir. 1993); United States v. James Daniel Good Property, 971 F.2d 1376 (9th Cir. 1992), accord Fausto Diaz-Oliver's Post-Trial Mem. ("F. Diaz-Oliver Mem.") at 19-21, according to which the discovery occurs when the government possesses "the means to discover" the alleged wrong.  There is nothing in the test used by the Sixth, Eighth and Ninth Circuits that invalidates, mitigates, or contradicts the traditional requirement that the fraud should be detectable with reasonable diligence.

[4] The definition of "due diligence" is "[s]uch a measure of prudence . . . as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances . . . .";  compare "extraordinary diligence" and "great diligence."  BLACK'S LAW DICTIONARY (6th ed.) at  457.

knowledge of facts that: (1) amounted to more than a mere suspicion; and (2) could have led a man of ordinary prudence to learn of the fraud or the possibility of fraud under the particular circumstances.

For the reasons stated below, this Court finds that Customs received information or knowledge of such facts at the meeting that took place on March 29, 1993.

### C. Defendants' Evidence With Regard to the March 24, 1993, Phone Call

The evidence presented by Defendants in support of their position falls into two categories: (1) evidence of reliability of the information Customs has received on March 24, 1993, as a result of the phone call between Zell and Carelli; and (2) evidence of sufficiency of this information. The Court addresses each set of evidence in turn.

#### 1. The Information Conveyed to Customs on March 24, 1993, Did Not Amount To Anything But a Mere Suspicion

Defendants allege that Customs considered the content of the phone call reliable because of the following: (1) Zell introduced

himself to Carelli as an ex-federal law enforcement officer; (2) Zell stated that he was employed by H&K, a reputable law firm, and the information was to be produced by a client of H&K; (3) Carelli, a Customs agent with a busy schedule, agreed to take time to attend the meeting at H&K and, therefore, to spend one hour on the road; (4) Avers, who had a very substantial set of responsibilities and, consequently, a very busy schedule, see Tr. at 194-98, agreed to accompany Carelli and spent the total of approximately three and a half hours riding to and attending the meeting; and (5) Avers notified her supervisor of her plans to attend the meeting. See Tr. 28-30. Defendants conclude that the aforesaid actions indicated that: (1) Customs had to and actually did allocate the phone call from Zell extreme importance; and (2) such extreme importance demonstrates that the information allegedly conveyed during the phone call felt out of realm of suspicion and into the realm of reliable evidence which cast upon Customs the duty of inquiry. See id.

This Court is not convinced. First, Zell testified that he did not remember specifying to Carelli the exact places of his prior employ in his capacity as a law enforcement officer. See Tr. at 63. There was no evidence presented showing that either Carelli or Avers conducted any check of Zell's credibility and/or background. Customs could doubt or even ignore Zell's statement

that he was an ex-federal law enforcement officer and, therefore, consider the information given by Zell as trustworthy or as questionable as if it were coming from any "tipster."[5]

Next, both Carelli and Avers testified that although the fact that the phone call was coming from and the documents were to be supplied by a reputable law firm like H&K was a factor that prompted them to attend the meeting, see Tr. at 157, 202-03, 215-16, they both testified that they did not know what information they were to receive at the meeting. See id. Indeed, an invitation from a reputable law firm does not necessarily guarantee that the information the firm offers is reputable. A law firm operating on behalf of its client may be propelled to act by less than righteous motives frequent in litigious process. The value of the information, therefore, may be inadvently misrepresented or unduly enhanced. Carelli and Avers would have been indeed

---

[5] Defendants assert that Zell had to sound credible to Carelli because of the following: (1) Zell was recently hired by H&K; (2) Zell wanted to seize the opportunity to show H&K that Zell "could do something;" and (3) Zell made an extra effort to get Carelli's attention. See Tr. at 28. While it is not the position of this Court to ascertain or question either Zell's usefulness to H&K in other assignments or Zell's level of zeal in his execution of those assignments, the Court does not share Defendants' confidence that Zell's earnest desire to instill credibility necessarily translated into Carelli's belief that the caller was credible. Indeed, Zell testified that Carelli "indicated that he would want to come out and see for himself the documents," Tr. at. 66 (emphasis supplied), a statement certainly not indicating solid reliance on the part of Carelli.

justified in doubting the reliability of the information even if they did not doubt the reliability of the source. Accord Tr. at 216. Considering that both Carelli and Avers testified that they were going to the meeting "in the blind," see Tr. at 157, 207, this Court has no reason to find that either Carelli or Avers allocated extreme importance to the information received on March 24, 1993.

Finally, while Carelli and Avers did acknowledge that attending a meeting at a location other than Customs was a rare practice, they both stated that such practice nonetheless took place, in spite of busy schedules of both officers.[6] See Tr. at 143-44, 212-13. Different people have different approaches and modes in which they execute their duties. Defendants offered no evidence showing that the three and a half hours field trip was entirely incompatible with Carelli or Avers' working pattern. Accordingly, this Court finds it hard to fathom why the field trip or Avers' act of notifying her supervisor about her anticipated absence, see Tr. at 209-10, 236, is categorized by Defendants as an extraordinary conduct.

In sum, the actions of Zell, Carelli and Avers that Defendants claim to be evidence supporting the reliability of the information

---

[6]Avers testified that she occasionally accompanied Carelli on field trips. See Tr. at. 143-44.

conveyed during the March 24, 1993, phone call verifies only the fact that Customs officers hoped that the field trip would not be in vain.  While the aforesaid actions indicate the presence of suspicion on the part of Customs, none of these actions indicates that Customs was propelled to attend the March 29, 1993, meeting by receipt of what could be qualified as reliable information.  See BLACK'S LAW DICTIONARY (6th ed.) at 1447.


### 2. It Is Unlikely That the Information Conveyed to Customs on March 24, 1993, Was Sufficient

Defendants allege that the content of the March 24, 1993, phone call provided Customs with sufficient evidence because: (1) Zell furnished Carelli with the names of Spanish Foods and Martinez, see Tr. at 29, 485, 494-95;[7] and (2) the names of Spanish

---

[7] One of the Defendants, Fausto Diaz-Oliver ("F. Diaz-Oliver"), asserts that the notes that Carelli took during the March 29, 1993, meeting were actually taken by Carelli during the phone call on March 24, 1993.  See F. Diaz-Oliver Mem. at 17-18.  F. Diaz-Oliver points out that the name of Lilliam Martinez was misspelled by Carelli as "Lillian," using a traditional spelling. F. Diaz-Oliver deduces that the misspelling indicates that the notes were taken by Carelli prior to Carelli's opportunity to examine the documents that had on their face the name of Lilliam Martinez and were presented by Gonzalez during the March 29, 1993, meeting.  F. Diaz-Oliver concludes that this fact verifies that on March 24, 1993, Carelli was furnished with all the information reflected in Carelli's notes, including the name of Spanish Foods, Martinez, and the term "double invoicing."

This Court is not convinced.  Zell testified that during his meeting with Mencio and Gonzalez he took down the name of Martinez. See Tr. at 54, 68.  In addition, Defendants assert that Carelli did

Foods or Martinez gave Customs enough information to detect fraudulent transactions through the use of Customs' ACS and TECS computer queries.  See id. at 502.

A TECS computer query allows a researcher to determine whether the importer is subject to Customs' ongoing investigations.[8]  See Tr. at 106, 227.  Upon a proper submission, an ACS computer query could lead a researcher to the entry documents filed by the importer, prices declared, the identity of the product lines imported and the names of exporters.  See Tr. at 108-10, 112, 228. An ACS query, however, does not provide the information whether fraud was committed or if a double invoicing system was used in particular.  See id. at 134-35, 236-37.  Had Carelli submitted the name of Spanish Foods for an ACS query, he would have received over 350 entries without any information on which ones of those entries, if any, were fraudulent.  See id. at 118-19.

_____

not examine the documents presented by Gonzalez until after the meeting.  See R. Diaz-Oliver's Br. at 25.  Had Zell actually given the name of Martinez to Carelli, he would have every reason to spell the unusual name.  Conversely, there would have been no reason to provide Carelli with the correct spelling of Martinez' first name if Carelli were handed the documents at the time he was taking his notes.

Therefore, if the misspelling verifies anything, it verifies that more likely than not Carelli was not given the name of Martinez during the March 24, 1993, phone call.

[8]  Spanish Foods had no TECS record on March 24, 1993.

Defendants are implying that Carelli could determine that the type of fraud was double invoicing. <u>See</u> Tr. at 128-29. Because there are numerous violations of Customs Law and Carelli would have no means to know what to search for, this Court cannot embrace Defendants' broad proposition.

Carelli's research would have been narrower and, therefore, could possibly have been conducted had Carelli known that: (1) the violation in issue was double invoicing; and (2) either the name of the product line fraudulently exported or the name of the exporter selling the product in issue to Spanish Foods.

Defendants acknowledge that during the March 24, 1993, phone call, Zell did not identify the name of the product line in issue or the exporter to Carelli. <u>See</u> Pl.'s Br. at 7. Defendants, however, claim that: (1) Zell mentioned to Carelli that the violation in issue was double invoicing;[9] and (2) Carelli, therefore, could identify the fraudulent transactions even without knowing the line of the product or the name of the exporter, merely by comparing the prices submitted by Spanish Foods on every product

---

[9]Zell testified that he conveyed to Carelli that he, Zell, has "read" documents (meaning had the documents translated to him) that "looked to be duplicate invoices for different amounts of money, with a cover letter explaining how to use those documents, that one [of those duplicates] could be used to submit to Customs." Tr. at 65.

of each entry to those submitted by other companies on the products
analogous to those imported by Spanish Foods.[10]  See Tr. at 228-30.
In view of the fact that there were over 350 ACS entries by Spanish
Foods, this Court is hesitant to hold that this monumental task is
"such a measure of prudence . . . as is properly to be expected
from, and ordinarily exercised by, a reasonable and prudent man
under the particular circumstances . . . ."  BLACK'S LAW DICTIONARY
(6th ed.) at  457; accord Pl.'s Post-Trial Br. at 13-18 (pointing
out that there is no evidence that such massive investigation was
ever done, or is feasible, or could be successful); compare R.
Diaz-Oliver's Br. at 24 (alleging that the reasonableness of the
task is irrelevant to the issue of the discovery of fraud).

Moreover, the Court finds it unlikely that during the March
24, 1993, phone call Zell did indicate to Carelli that the
violation in issue was double invoicing.  The pertinent evidence is
as follows: (1) Zell's time sheet shows a March 24, 1993, entry
reading that Zell "confer[ed] with U[nited] S[tates] Customs
special agent Frank Carelli regarding assistance by Customs," see
Def.s' Mem., Ex. 5 at 2-3; and (2) Zell's time sheet shows a March
29, 1993, entry reading that Zell attended a "meet[ing] with

---

[10] Defendants point out that Carelli eventually did this type
of comparison.  See Tr. at 529.  Defendants, however, fail to
observe that the comparison actually executed by Carelli was made
upon the information pointing out the wrongful transactions in
order to prove the fraud rather than to detect it.

U[nited] S[tates] Customs special agents and attend[ed] debriefing of client regarding <u>double invoicing</u> scheme by JASS . . . ."[11]  <u>See</u> <u>id.</u> at 3 (emphasis supplied).

While different people have different approaches and modes in which they execute their duties, each person tends to execute similar duties in a similar fashion.  <u>Compare</u> Martinez' Post-Trial Br. at 8 (failing to observe this fact and attempting to justify the inconsistency by stating that the entries are intended to be brief descriptions rather than diary type entries).  It is

---

[11] In addition, there are the following facts: (1) Zell's testimony reveals that Zell is not absolutely sure whether he used the precise term "double invoicing," <u>see</u> Tr. at 66; and (2) Carelli, in turn, testified that he did not remember Zell using the term "double invoicing," <u>see</u> Tr. at 104.

Defendants assert that Zell's testimony is particularly trustworthy as testimony against interest because Zell's testimony is likely to deprive Gonzalez, a client of Zell's employer, H&K, from moiety if it is established that it was Zell and not Gonzalez who was the source of the information that could lead the Government to recover penalty.  <u>See</u> R. Diaz-Oliver's Br. at 5. The logic of this argument is not entirely clear to the Court. While a possible desire of Zell to claim the moiety personally or the emotional forces behind the relationship between Zell, his employer and the employer's client are not the subject to be taken by the Court, it is apparent that neither Zell nor Gonzalez are to receive any moiety if the Government is to be defeated in this case.  Additionally, if the Government is to be defeated, Gonzalez will lose the opportunity to see Spanish Foods (the ex-business partner of GCI, Gonzalez' employer, who switched from GCI to JASS) brought to justice and properly punished.  This Court has no knowledge whether the ability to claim the moiety is more important to Gonzalez than seeing the Government prevail.  Therefore, it is speculative to suggest that Zell is willing to accommodate the financial but not emotional motives of Gonzalez.

undisputed that the subject of the meeting that took place on March 29, 1993, was the double invoicing.  It is equally undisputed that the meeting was a debriefing of Gonzalez, an H&K client, and that Gonzalez conveyed the name of JASS and the information about the double invoicing to Carelli and Avers.  Zell's March 29, 1993, entry properly reflects <u>all</u> of these identities and events.  <u>See</u> Def.s' Mem., Ex. 5 at 3.  Conversely, Zell's March 24, 1993, entry, while diligently identifying Carelli, omits any reference to a "double invoicing" scheme in the fashion of Zell's March 29, 1993, entry.  In fact, in his March 24, 1993, entry Zell referred to "assistance by Customs."  <u>Id.</u>

This leads the Court to conclude that on March 24, 1993, Zell, more likely than not, merely alerted Carelli to the general fact of a possible violation.  Assuming so, the information given by Zell provided Carelli with insufficient knowledge to conduct an ACS search and determine the presence of fraud in the entries declared by Spanish Foods.[12]

---

[12]    One of the defendants, Remedios R. Diaz-Oliver ("R. Diaz-Oliver"), points out that because the name of Spanish Foods was not present in Zell's March 29, 1993, entry while it is undisputed that Spanish Foods was discussed during the March 29, 1993, meeting, the fact of presence or omission of a term or a name is not representative of the subjects discussed. <u>See</u> R. Diaz-Oliver's Br. at 6-7.  R. Diaz-Oliver fails to observe that these similar omissions are consistent actions, unlike Zell's inconsistent entries about the "double invoicing."

In addition, R. Diaz-Oliver notes that "Carelli himself

## V. CONCLUSION

This Court concludes that Customs did not learn of the fraud or was not sufficiently on notice as to the possibility of fraud to discover its existence with the exercise of due diligence on March 24, 1993, the day of Zell's phone call to Carelli. Customs, however, was put sufficiently on notice as to the possibility of fraud on March 29, 1993, when Gonzalez provided Carelli and Avers with the double invoicing documents and the cover letter.

---

concedes that in March 24, 1993[,] telephone call, Mr. Zell stated that the issue involved double invoicing." Id. at 8 (citing to Tr. at 377). Carelli, however, did not concede exactly that. Carelli merely conceded recalling that he stated in his deposition that he "assumed [the prospect information] was about double invoicing." Tr. at 377 (emphasis supplied). This assumption hardly lends support to Defendants' claim that Customs received either sufficient or reliable evidence that amounted to anything more than a mere suspicion.

Therefore, the action in issue, commenced prior to the expiration of the five-year limitation period posed by 19 U.S.C. § 1621, was commenced in a timely fashion.  Based on the foregoing, it is hereby

     **ORDERED** that parties proceed with the litigation on merits.

 

 

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE


DATED:     February 2, 2001
            New York, New York