No. 51,733

Augusta Bank & Trust, *Appellee,* v. Don Broomfield, Jr., *Appellant,* v. Paul Mann, *Appellee,* and Don Broomfield, Jr., *Appellant,* v. Paul Mann, Town & Country Business Trust and First National Investors Corporation, *Appellees,* and Don Broomfield, Jr., *Appellant,* v. Paul Mann, Philip Hamm, James W. Vestring, Two Crow Ranch Corporation, A Kansas Corporation, Town and Country Business Trust, and First National Investors Corporation, A Kansas Corporation, *Appellees.*

(643 P.2d 100)

Opinion filed April 3, 1982.

*Calvin McMillan,* of Kaplan and McMillan, of Wichita, and *Doyle E. White, Jr.,* of El Dorado, were on the brief for the appellant.

*Philip A. Hamm,* of Davis, Hamm & Manley, of El Dorado, was on the brief for appellee Philip A. Hamm.

*R. A. Munroe,* of Augusta, was on the brief for appellees Augusta Bank & Trust, Two Crow Ranch Corporation and James W. Vestring.

*Cecil E. Merkel,* of Merkel Chartered, of Wichita, was on the brief for appellees Paul Mann, Town & Country Business Trust and First National Investors Corporation.

The opinion of the court was delivered by

HERD, J.: This is a consolidation of three cases. Case number 78 C 528, *Augusta Bank & Trust v. Don Broomfield,* was filed September 19, 1978. The bank claimed Broomfield owed $208,828.32 on a note. Broomfield counterclaimed, saying the bank induced him to take out the note to purchase heavy equipment, conspired to refuse to pay him for work done with the heavy equipment, and refused to collect on accounts he had assigned the bank as collateral. The jury awarded the bank $208,823.32 on the note and Broomfield $60,000 actual damages and $100,000 punitive damages on his counterclaim. Case number 79 C 37, *Don Broomfield v. Paul Mann, Town & Country Business Trust and First National Investors Corporation,* was filed January 19, 1979. Broomfield claimed he contracted with the appellees to level 640 acres of land known as "Kinsley Farms" and that he was owed $121,327.96 for work done. On March 31, 1979, he filed an amended petition claiming the defendants conspired to refuse to pay him and to persuade him to assign their accounts to Augusta Bank & Trust with no intention of paying these accounts. The jury awarded Broomfield $107,709.31 in actual damages and $400,000.00 in punitive damages. Case number 79 C 38, *Don Broomfield v. Paul Mann, Philip Hamm, James Vestring, Two Crow Ranch Corporation, Town & Country Business Trust, and First National Investors Corporation,* was filed January 19, 1979. Broomfield claimed he contracted with appellees to level 4,000 acres of the "Robbins Trust Land" and that appellees breached the contract after he had leveled 2,000 acres, forcing him to sell his heavy equipment. On May 31, 1979,

Broomfield filed an amended petition alleging appellees conspired to refuse to pay him for work done and induced him to borrow money from the bank with the understanding he would pay back the loans using money he received for the leveling project. The jury awarded Broomfield his balance due of $100,613.28 actual damages for breach of the contract of $99,741.00 and punitive damages of $100,000. Hamm and Vestring were absolved.

In a separate verdict pertaining to all three cases the jury awarded Broomfield $90,000 for his loss from the sale of the heavy equipment, $9,000 against the Bank, $72,000 against Paul Mann and $9,000 against First National Investors Corporation.

Upon post-trial motions, the trial court set aside all of Broomfield's punitive damages, finding no evidence of conspiracy, fraud or wanton conduct. It also set aside the award of $99,741 for loss of profits in case number 79 C 38 on the grounds the contract to level the 4,000 acres could not be performed within one year, making it unenforceable under K.S.A. 33-106, and the action for breach of contract was barred by the statute of limitations. Finally, the trial court set aside the $90,000 awarded Broomfield for damages arising from the sale of his heavy equipment. As a result, Augusta Bank & Trust was awarded $208,828.32 on the note and Broomfield was awarded $208,322.59 for work done on the Kinsley Farms and Robbins Trust land.

With this general outline of the three cases in mind, we can proceed to discuss the facts in some detail. The appellant is Don Broomfield, farmer, rancher, dirt mover and successful businessman in his own right. There are numerous appellees. Augusta Bank & Trust loaned Broomfield money to purchase the heavy equipment. Paul Mann established Augusta Bank & Trust in 1959. He was a director and member of the loan committee until 1978. He first set up the financing which allowed Broomfield to purchase the heavy equipment. Mann was one of the original owners of both the Robbins Trust land and the Kinsley Farms and was the agent in charge of land operations for both projects. James Vestring was president of Augusta Bank & Trust and head of the loan committee. He, along with Mann, owned the Robbins Trust land which Broomfield agreed to level. Philip Hamm was also on the loan committee of Augusta Bank & Trust and was a part owner of the Robbins Trust land until he sold out in August

of 1975. First National Investors Corporation (FNIC) is a holding company, controlled by Paul Mann, which owned part of the Robbins Trust land and Kinsley Farms. Town & Country Business Trust is a publicly owned business trust of which Paul Mann is one of the trustees. It was one of the original owners of the Robbins Trust land. Two Crow Ranch Corporation was owned in equal shares by James Vestring and Paul Mann. It was also one of the original owners of the Robbins Trust Land until it sold its interest in January of 1976. Mann later purchased Vestring's interest in Two Crow.

In September of 1973 Mann, Hamm, Two Crow, Town & Country and FNIC purchased the Robbins Trust land. They planned to level this tract of 4,000 acres for irrigation purposes. After some preliminary leveling by two other contractors, Broomfield began working on a machine-hour basis in September of 1974. In November of 1974 Broomfield met at the Kinsley Airport with Mann, Hamm, Vestring and Ivan Salyer, a trustee of Town & Country. Mann had been talking about Broomfield buying additional equipment so the project could be completed more quickly. At the meeting Broomfield told the others he "certainly couldn't work on one quarter of land, and borrow thousands and thousands of dollars to purchase this equipment . . . ." In other words, Broomfield wanted an agreement for him to level the entire 4,000 acres if he was to purchase additional equipment. After discussion about the particulars of the project Broomfield was told, "Well, we will let you know."

Later Paul Mann called Broomfield and said, "I now have approval for you to go ahead with the land leveling, start looking and finding equipment." Mann was the agent for the project, signing letters which enclosed checks in payment for Broomfield's work. Philip Hamm testified, "Paul Mann, it was understood, managed the Robbins Land. That was his chore." Augusta Bank & Trust helped finance Broomfield's purchase of equipment for the leveling project. Mann, Hamm and Vestring sat on the loan committee along with Wilbur Smith, senior vice-president of the bank. Smith testified new or renewal notes were executed on the heavy equipment loan some twenty-three times.

Four billings for work on the Robbins Trust land were timely paid. In March of 1975, however, payments became erratic. As a result of the nonpayment of money owing to him, Broomfield fell

behind in his loan payments to the bank. Mann testified the delay in making payments to Broomfield was because, "the scope of this project had got so much bigger than we anticipated, and I think we were short of money."

Despite the financial problems of the Mann group in paying Broomfield and of Broomfield in paying the bank, appellant continued to work on the Robbins Trust land. He had completed work on the southern 2,000 acres when, in the Fall of 1975, Mann told him to select "out of the north half the five smoothest" quarter sections for the next phase of the project. This Broomfield did and began leveling work on two of these sections. Sometime between the fall of 1975 and the spring of 1976, Paul Mann told Broomfield to "hold off" on the Robbins Trust land project.

During this period of time Hamm and Vestring apparently became displeased with the progress on the Robbins Trust land project. In August of 1975 Hamm sold his interest in the land to Mann. Vestring did the same in January of 1976.

In the Spring of 1976, Broomfield agreed, at Mann's urging, to level some land on the Kinsley Farms. Broomfield leveled four quarters of land and at the date of trial was owed $107,709.31 for this work. After completing the Kinsley Farms project in July of 1976, Broomfield moved part of his equipment back to the Robbins Trust land expecting to continue his work there pursuant to the agreement.

As Broomfield continued to lag in his payments on the heavy equipment loan, the bank became anxious and asked for more security. In March of 1976 and June of 1977, Broomfield executed general assignments to the bank covering accounts receivable from the Kinsley Farms and Robbins Trust land projects. Broomfield believed since his debtors were also the directors of the bank the accounts would be paid and his note reduced accordingly.

In early May of 1976, Paul Mann shocked Broomfield with the remark that "he was winding up his work" and that they should be getting ready to sell the machinery. Broomfield later received a letter from the bank dated May 20, 1976, advising his heavy equipment loan should be paid "on or before September 15, 1976." He then received a follow-up letter dated May 25, 1976, which stated:

"Our loan committee was informed by Mr. Paul Mann that you would be writing

us a letter giving us the necessary dates that you would be completing work with your heavy equipment and getting it ready for sale, and to assure us that you would make every attempt to pay your loan line on the heavy equipment in full by September 15, 1976."

The equipment sale was held on September 11, 1976. John Spratt had appraised the value of Broomfield's equipment at $375,000. Proceeds from the sale were $135,500. Broomfield later sold another piece of equipment for $50,000. He was unable to sell two bulldozers which, at the time of trial, Broomfield valued at $35,000. These figures form the basis for Broomfield's claim of a loss of $154,500 from the forced sale of his equipment.

In December of 1976 Broomfield entered into a contract with Mann to purchase the Robbins Trust land. Broomfield's health worsened, however, and the deal fell through.

Appellant contends the trial court erred in setting aside the actual and punitive damages awarded by the jury. In discussing this claim we will examine each verdict separately along with related issues.

Let us first note the proper standard for ruling on a motion for judgment notwithstanding the verdict. In deciding a motion for judgment notwithstanding the verdict, the trial court must determine whether there is any substantial evidence to sustain the verdict. *Apperson v. Security State Bank,* 215 Kan. 724, 732, 528 P.2d 1211 (1974). The trial court is required to view the evidence and inferences therefrom most favorable to the party against whom the motion is made. *Hallett v. Stone,* 216 Kan. 568, 577, 534 P.2d 232 (1975). *Traylor v. Wachter,* 227 Kan. 221, 228, 607 P.2d 1094 (1980), states:

"The court does not weigh evidence but must accept as true all the facts which the evidence tends to prove and draw against the party making the motion all reasonable inferences most favorable to the party opposing the motion and if the evidence is of such character that reasonable men in an impartial exercise of their judgment may reach different conclusions, then the case should be submitted to the jury. [Citations omitted.] The appellate court must do the same."

In case number 79 C 38, Broomfield alleged, and the jury found, an oral contract between Broomfield and appellees whereby Broomfield was to level 4,000 acres of the Robbins Trust land. The jury also found the appellees breached the contract entitling Broomfield to $99,741 in damages; $59,845 attributable to Paul Mann, Town & Country and FNIC and $39,896 attributable to Two Crow. The trial court set aside this award ostensibly

for two reasons. First, the trial judge stated the oral agreement to level the Robbins Trust land would take more than one year to complete and as such would be unenforceable under K.S.A. 33-106, the statute of frauds. Secondly, he held since breach of contract was not alleged until the amended petition was filed May 31, 1979, and the jury found the contract was breached in May of 1976, this claim was barred by K.S.A. 60-512, the three-year statute of limitations applicable to oral contracts.

Although not discussed by the parties, the answer to the statute of limitations issue is clear. The original petition in case number 79 C 38 was filed January 19, 1979. It alleged a contract to level 4,000 acres of land and nonpayment for work done pursuant to that contract. The amended petition was filed May 31, 1979, and in part alleged damages flowing from the breach of the oral contract. K.S.A. 60-512 requires an action for breach of an oral contract to be brought within three years from the date of the breach. K.S.A. 60-215(c) states:

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

In *James v. City of Wichita,* 202 Kan. 222, 226, 447 P.2d 817 (1968), this court stated:

"The present rules of practice in Kansas are patterned after the federal rules. The federal rules seek to make pleadings and amendments less technical in keeping with the idea that pleading a precise cause of action should not be the deciding factor. The deciding factor on relating an amendment back to the petition is whether the other party was actually notified of the litigation involving a described conduct, transaction or occurrence."

Even an amendment changing the legal theory on which an action was originally brought may relate back if the factual situation remains the same and has been brought to the defendant's attention by the original pleading. *Brooks v. Dietz,* 218 Kan. 698, 703-04, 545 P.2d 1104 (1976).

Clearly, the claim in the amended petition "arose out of the conduct, transaction or occurrence" set forth in the original petition, which was filed within three years from May 1976, the date the contract was breached according to the jury. Further, the original petition notified the appellees of litigation involving the Robbins Trust land project. As such the amended petition relates back. The statute of limitations does not bar recovery.

Resolution of the statute of frauds issue is no less complicated. K.S.A. 33-106 states:

"No action shall be brought whereby to charge a party . . . upon any agreement that is not to be performed within the space of one year from the making thereof, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person thereunto by him or her lawfully authorized in writing."

When a defendant asserts the statute of frauds as an affirmative defense, the burden of proof is on him. In this case appellees must show the contract to level the Robbins Trust land could not have been performed within one year. 73 Am. Jur. 2d, Statute of Frauds § 605, p. 245. Appellees offered statements by Broomfield to the effect that, with the same equipment, it would have taken him approximately one year to level the other 2,000 acres. Broomfield based this estimate on the fact it took him a year to complete the first 2,000 acres. Thus, appellees argue, the oral agreement could not have been performed within one year and as such is unenforceable. We do not agree.

"The statute of frauds was enacted to prevent fraud and injustice, not to foster or encourage it, and courts will, so far as possible, refuse to allow it to be used as a shield to protect fraud and as a means to enable one to take advantage of his own wrong." *Walker v. Ireton,* 221 Kan. 314, 320, 559 P.2d 340 (1977).

More specifically, Restatement (Second) of Contracts § 130 (1981), comment (*a*), is instructive:

"The English Statute of Frauds applied to an action 'upon any agreement that is not to be performed within the space of one year from the making thereof.' The design was said to be not to trust to the memory of witnesses for a longer time than one year, but the statutory language was not appropriate to carry out that purpose. The result has been a tendency to construction narrowing the application of the statute. Under the prevailing interpretation, the enforceability of a contract under the one-year provision does not turn on the actual course of subsequent events, nor on the expectations of the parties as to the probabilities. Contracts of uncertain duration are simply excluded; the provision covers only those contracts whose performance cannot possibly be completed within a year."

We have, in essence, adopted this policy. See *In re Estate of Hargreaves,* 201 Kan. 57, 62, 439 P.2d 378 (1968); *King v. Robbins,* 193 Kan. 70, 74, 392 P.2d 154 (1964); *Cassity v. Cassity,* 147 Kan. 411, 416, 76 P.2d 862 (1938).

Here, with more equipment and more personnel, the contract to

level the Robbins Trust land could have been performed within one year. There was no evidence offered to show performance could not *possibly* have been completed within a year. Thus, the contract does not fall within the terms of K.S.A. 33-106.

However, even if the action for breach of contract is allowed, appellant cannot succeed without showing substantial evidence a contract was entered into, breach of that contract, and damages flowing from the breach.

In order for parties to form a binding contract, there must be a meeting of the minds as to all essential terms. *Sidwell Oil & Gas Co. v. Loyd,* 230 Kan. 77, 79, 630 P.2d 1107 (1981). Where the evidence pertaining to the existence of a contract is conflicting a question is presented for the trier of fact. The controlling question as to whether a binding contract was entered into depends on the intention of the parties and is a question of fact. 230 Kan. at 83. *Phillips & Easton Supply Co., Inc. v. Eleanor International, Inc.,* 212 Kan. 730, Syl. ¶ 3, 512 P.2d 379 (1973). Although the contract here was not a particularly specific one, there was substantial competent evidence from which the jury could have found the existence of a contract. Broomfield testified he met with the owners of the Robbins Trust land to discuss the project. They told him they would let him know about their decision. Paul Mann then called Broomfield and told him to start obtaining equipment. Broomfield testified he was going to level the southern 2,000 acres first and then proceed to the northern half. Further, the conduct of the parties shows a meeting of the minds with regard to price. Appellant billed appellees and was paid with checks from the different entities involved and sent by Mann as the agent for the owners. Finally, a letter from Mann to Hamm and Vestring discussing "the job we are getting done with Don Broomfield" and how they had "lined up" Broomfield for the project was admitted into evidence.

The next question is the propriety of the $99,741 in damages awarded Broomfield for the breach of contract. This figure was testified to by Bill Kirkpatrick, a C.P.A. and Broomfield's accountant, as representing "net income before depreciation," or how much more in profits Broomfield would have received had he been allowed to level the entire 4,000 acres. The figure of $24,953 was offered by Hamm to show net profit after depreciation.

The rules regarding loss of profits as damages in a breach of contract case were thoroughly discussed in *Vickers v. Wichita State University,* 213 Kan. 614, 518 P.2d 512 (1974). There it was stated:

"This court follows the general rule that loss of profits resulting from a breach of contract may be recovered as damages when such profits are proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties. [Citation omitted.] Recovery for loss of profits caused by a breach of contract depends upon the facts and circumstances of each particular case. [Citation omitted.]

. . . .

"The fact that damages cannot be calculated with absolute exactness will not render them so uncertain as to preclude an assessment.

. . . .

"Unquestionably, a method of establishing a loss of profits with reasonable certainty is by showing a history of past profitability. Past profitability of a particular business is not, however, the only method of proving lost future profits. The evidence necessary in establishing lost future profits with reasonable certainty 'must depend in a large measure upon the circumstances of the particular case. . . .' [Citation omitted.] Absolute certainty in proving loss of future profits is not required. [Citation omitted.] What is required is that the court or jury be guided by some rational standard. [Citations omitted.] As to evidentiary matters a court should approach each case in an individual and pragmatic manner, and require the claimant furnish the best available proof as to the amount of loss that the particular situation admits. [Citation omitted.] It is the responsibility of a district court to see that speculative and problematical evidence does not reach the jury. [Citation omitted.]

"Strict application of the certainty doctrine would place a new business at a substantial disadvantage. To hold recovery is precluded as a matter of law merely because a business is newly established would encourage those contracting with such a business to breach their contracts. The law is not so deficient. [Citation omitted.]" 213 Kan. at 618-20.

Broomfield bought heavy equipment in reliance on the contract to level the entire 4,000 acres. He was unable to use the equipment on other projects because he subsequently had to sell it. Conflicting evidence regarding damages was offered. The jury weighed that evidence and agreed with Broomfield. We hold there was substantial evidence to sustain the jury verdict.

Broomfield claimed a loss of $154,000 on the sale of his equipment. The jury awarded him $90,000. Without stating a specific reason, the trial judge set aside this award. We reverse and hold there was substantial evidence to support the jury's decision. The bank's letters and the actions of Paul Mann indicate the sale was not voluntary on the part of Broomfield. He was

forced to sell the equipment because appellees breached the contract to level the Robbins Trust land. The evidence showed proceeds from the sale were less than the appraised value of the equipment, thereby causing damages.

In case number 78 C 528 Broomfield alleged in his counterclaim the bank officers conspired to refuse to pay for the leveling work, forced him to assign accounts receivable to the bank and then "wrongfully and fraudulently refused to collect said accounts receivables." The jury awarded Broomfield $60,000 in actual damages and $100,000 in punitive damages against the bank. The actual damages were allowed because Augusta Bank & Trust, by and through its officers, had "acted wrongfully, wantonly or fraudulently in its dealings with Don Broomfield, Jr." Broomfield's amended petition in 79 C 37, the Kinsley Farms case, alleged appellees conspired "to refuse to pay plaintiffs bills" and to "persuade the plaintiff to assign his unpaid accounts receivable" to the bank with no intention of paying those accounts and also that the conduct of appellees in not paying those accounts and also that the conduct of appellees in not paying the bills owing appellant was "willful, malicious, false and fraudulent." The jury awarded Broomfield $400,000 in punitive damages against Paul Mann and FNIC. The allegations in 79 C 38 are the same as those in 79 C 37 with the addition of the breach of contract claim. There the jury awarded Broomfield $100,000 in punitive damages, $60,000 against Paul Mann and $40,000 against Two Crow. The trial court set aside the $60,000 in actual damages and the $600,000 in punitive damages because it found there was no evidence to support them.

Let us examine the trial court's action. First, it is argued the claim of fraud runs afoul of K.S.A. 60-513, which states any action for fraud not brought within two years of the discovery of the fraud is barred. The allegations of fraud were made in the amended pleading of May 31, 1979. For reasons already set forth, these allegations would relate back to the original petition filed in January of 1979. The trial court held any fraud should have been discovered after the sale of equipment in September of 1976. We decline to take such a restrictive view.

"Discovery of the fraud" has been defined by this court to mean the time of actual discovery or when, with reasonable diligence, the fraud could have been discovered. See *Wolf v. Brungardt,* 215

Kan. 272, 281, 524 P.2d 726 (1974). It does, however, imply actual knowledge, not mere suspicion of wrong. Further, even though his suspicions might have been aroused a party may be lulled into confidence by certain representations and forego any further investigation. See *Mingenback v. Mingenback,* 176 Kan. 471, 478, 271 P.2d 782 (1954). Here the evidence indicates Broomfield was lulled into confidence by the representations of Paul Mann that he would eventually be paid. Indeed, as late as June 1977 Broomfield made assignments of accounts receivable to the bank, fully expecting those accounts to be paid because the directors of the bank were also debtors on the accounts. We hold the fraud was not discovered until after June of 1977. Consequently, Broomfield's action was timely filed.

As to punitive damages, we stated in *Newton v. Hornblower, Inc.,* 224 Kan. 506, 525, 582 P.2d 1136 (1978):

" '[Punitive damages] are permitted whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy. [Citations omitted.] Such damages are allowed not because of any special merit in the injured party's case, but are imposed by way of punishing the wrongdoer for malicious, vindictive or a willful and wanton invasion of the injured party's rights, the purpose being to restrain and deter others from the commission of like wrongs. [Citations omitted.]' "

And in *Nordstrom v. Miller,* 227 Kan. 59, 70, 605 P.2d 545 (1980):

"Punitive damages are not an automatic, mandatory result even when recklessness is shown, but are awarded in the discretion of the trial court."

See also *Sanders v. Park Towne, Ltd.,* 2 Kan. App. 2d 313, 318-19, 578 P.2d 1131, *rev. denied* 225 Kan. 845 (1978); *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 596 P.2d 816 (1979); *Henderson v. Hassur,* 225 Kan. 678, 594 P.2d 650 (1979).

In *Temmen v. Kent-Brown Chev. Co.,* 227 Kan. 45, 51, 602 P.2d 95 (1980), we discussed punitive damages in a breach of contract action:

"We have long adhered to the rule that damages for breach of contract are limited to pecuniary losses sustained, and exemplary or punitive damages are not recoverable in the absence of an independent tort. [Citation omitted.] Proper allegations of fraud, malice, gross negligence, oppression or wanton disregard of plaintiff's rights are needed in order to recover punitive damages."

To sustain his prayer for punitive damages appellant relies on proof of fraud. The jury determined appellees were guilty of

fraud. In *Citizens State Bank v. Gilmore,* 226 Kan. 662, 667, 603 P.2d 605 (1979), we considered this subject, quoting 37 C.J.S., Fraud § 1, p. 204:

" 'While the broad outlines of fraud have been indicated by regarding it as including any cunning, deception, or artifice used, in violation of a legal or equitable duty, to circumvent, cheat, or deceive another, the forms it may assume and the means by which it may be practiced are as multifarious as human ingenuity can devise, and the courts consider it unwise or impossible to formulate an exact, definite, and all inclusive definition thereof. It is synonymous with, or closely allied to, other terms indicating positive and intentional wrongdoing, but is distinguishable from mistake and negligence.' "

In the same vein is 37 Am. Jur. 2d, Fraud and Deceit § 1, p. 19:

"Fraud therefore, in its general sense, is deemed to comprise anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed, resulting in damage to another  . . . ."

We commented on proof of fraud in *Nordstrom v. Miller,* 227 Kan. at 65:

"We have held fraud is never presumed and must be proven by clear and convincing evidence. [Citations omitted.] The term 'clear and convincing evidence' means:
" '[T]he witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered, the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.' [Citations omitted.]
" 'The existence of fraud is ordinarily a question of fact.' "

Viewing all the evidence and inferences therefrom in the light most favorable to Broomfield, we cannot escape the conclusion there is substantial evidence to support the jury's awards. The landowners led Broomfield down the "primrose path." By their promise of 4,000 acres of leveling work, their assurances he would never lose money on the project, and their lending him the purchase price, they actually caused Broomfield to purchase a half million dollars worth of equipment to be used for their benefit, knowing all the time he was dependent on their payments to pay for his equipment. In spite of these representations and Broomfield's reliance thereon, they refused to pay him the money he had earned and ultimately stopped the work before completion. Broomfield was then led to the Kinsley Farms project as a sort of "stopgap" measure between phases of the Robbins Trust

land project. He dutifully performed this work but was again denied any remuneration. The final consequence of Broomfield's business deal with appellees was a distress sale where Broomfield was forced to sell his equipment at great loss. Obviously, appellees' actions rise above the level of mere negligence or mistake. We hold there was substantial evidence to support the jury determinations. The judgment of the trial court is reversed and remanded with directions to reinstate the jury verdicts.