**KANSAS WASTEWATER, INC. and Wastewater Treatment, Inc., Plaintiffs and Counterclaim Defendants,**

v.

**ALLIANT TECHSYSTEMS, INC., Defendant and Third–Party Plaintiff.**

No. 02–2605–JWL.

United States District Court, D. Kansas.

April 18, 2003.

William F. Ford, Jr., Lathrop & Gage, L.C., Kansas City, MO, Carrie E. Josserand, Lathrop & Gage, L.C., Overland Park, KS, for Alliant Techsystems, Inc.

Thomas M. Martin, Elizabeth Drill Nay, Scott A. Wissel, Lewis, Rice & Fingersh, L.C., Kansas City, MO, for Kansas Waste Water, Inc.

## MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

This action arises out of Alliant Techsystems, Inc.'s ("Alliant") contract with Kansas Wastewater, Inc. ("KWWI") and Wastewater Treatment, Inc. ("WTI") permitting KWWI and WTI to use a portion

of the facilities at the Sunflower Army Ammunition Plant ("SFAAP") to process non-hazardous wastewater. KWWI and WTI allege that Alliant breached the contract and made fraudulent and negligent misrepresentations in the inducement of the agreement and throughout the life of the agreement.

The matter is currently before the court on Alliant's motion for summary judgment on the fraud and misrepresentation claims (Doc. 9). It argues that such claims were filed after the statute of limitations expired. KWWI and WTI concede that Alliant's initial act of inducing them to sign the contract (in what they believe was a fraudulent manner) was taken in 1995 and 1996; however, they argue that they could not have discovered the fraud, due to Alliant's ongoing representations concealing the fraud and the fact the fraud in part related to the termination provisions, until Alliant notified them on March 29, 2001 that the contract was being terminated. Thus, they argue that they filed their lawsuit within the two year statute of limitations for such claims. For the reasons set forth in more detail below, the court believes that KWWI and WTI have demonstrated a genuine issue of material fact as to whether they should have discovered the alleged fraud before December 5, 2000. Thus, the court denies Alliant's motion for summary judgment.

## I. Uncontested Facts

The following facts are either uncontroverted or, if controverted, construed in the light most favorable to KWWI and WTI, the nonmoving parties.

The United States Army owns the SFAAP. In March of 1995, the Army entered into a Facilities Use Contract that permitted Alliant to operate and manage the SFAAP and enter into approved agreements with commercial tenants. Alliant consummated such a contract, known as a Facility Use Agreement ("FUA"), with KWWI and WTI—affiliated corporations, both wholly-owned by Chemical Recovery Corporation—on March 20, 1996.[1] The FUA enabled KWWI and WTI to use a portion of the facilities at the SFAAP to process non-hazardous wastewater. The FUA was "subject to" Alliant's contract with the Army.[2]

In November of 1997, the United States Army made a preliminary decision to "excess" the SFAAP, meaning the Government determined that the property no longer met its needs and was available for disposal. Gayle Frazier, a representative of Alliant, informed KWWI and WTI of the Government's decision by letter dated February 6, 1997. The letter, sent to all SFAAP tenants, stated: "There is a possibility, as this process progresses, the Army could decide not to excess Sunflower." It further instructed that the Army's preliminary decision to excess the SFAAP would not impact KWWI and WTI's lease at the SFAAP and that business should continue "as usual." Thomas McNally, KWWI and WTI's indirect owner, followed up with Ms. Frazier regarding concerns the letter raised. She told him "not to worry about it," and "we have been down this road before," and that Alliant was actively seeking tenants. Alliant later told Mr. McNally that its mission was one of

1. Although the parties disagree on whether WTI is a party to the FUA, the dispute does not impact the statute of limitations issue.

2. The parties drastically differ on their characterization of the events surrounding the signing of the FUA. On this motion for summary judgment the court must of course view the facts from KWWI's and WTI's perspective. However, because the characterization of these facts does not impact the statute of limitations issue, the court will not discuss those events.

ongoing tenant support and asked him to continue making payments and keep his operations running.

At some point late in 1997 or 1998, KWWI and WTI learned that the government was considering selling the SFAAP to the State of Kansas, who, in turn, would sell the property to the Oz Entertainment Company (the "Oz Group"). The Oz Group intended to develop a theme park. The proposed sale garnered significant media attention and spurred litigation in federal court in this District. In particular, Alliant references an October 1, 1997 article in the *Lawrence Journal World* discussing the possible sale. Alliant also points out that there were public meetings held regarding the sale as early as 1997 (which KWWI and WTI's plant manager attended), the Kansas legislature had open debate on the issue in 1999, and the Army's draft sale documents, dated May 24, 2000, which required the termination of KWWI, were put out for public comment. Also, there were two federal court cases in this District relating to the decision to excess and sell the SFAAP. *See United Tribe of Shawnee Indians v. United States*, 55 F.Supp.2d 1238 (D.Kan.1999); *Taxpayers Opposed to Oz v. GSA*, Case No. 00–2136–CM (D.Kan.2000). In *United Tribe of Shawnee Indians*, the court noted that the authority to enter into facility use agreements was revoked once the Army deemed the SFAAP excess. 55 F.Supp.2d at 1245.

In addition to this publicly available information, there was frequent correspondence between the parties regarding the potential sale to the Oz Group. For example, Alliant notes that it informed Mr. McNally, by letter dated July 19, 1999, of the Army's planned sale of the SFAAP. The next day, KWWI's current counsel sent a letter to Alliant and the Army objecting to the Army's removal of rail lines, acknowledging the plans for the Oz theme park, and asking the Army and Alliant to clarify the Army's position regarding KWWI's lease with Alliant. Further, KWWI and WTI explain that on June 13, 2000, Ms. Frazier informed Mr. McNally by letter that "there is no assurance the [Oz] conveyance will be accepted or rejected" and that the pendency of the Oz project "does not change the agreement currently in place between Alliant and KWWI." Also, on January 22, 2001, Alliant acknowledged that the status of the Oz project was currently unknown. Moreover, according to KWWI and WTI, Alliant repeatedly informed them that, in the unlikely event that the SFAAP was sold to the Oz Group, KWWI and WTI would receive a lucrative buy-out of their existing, valid FUA with Alliant.[3]

Alliant announced in July of 1999 that its current contract with the Government was to expire in March of 2000. Specifically, Ms. Frazier sent a letter, dated July 19, 1999, to Mr. McNally informing him that Alliant's contract would expire and that another entity would likely be managing the plant. KWWI and WTI contend that Ms. Frazier later told Mr. McNally that she was not sure if Alliant was going to stay at the SFAAP, and even if Alliant left, KWWI and WTI could remain at the SFAAP. After the July announcement, Alliant obtained three six-month extensions that allowed it to stay at the plant until September 30, 2001. Mr. McNally stated that after Alliant received the extensions, it did not inform him that it was

---

**3.** Alliant controverts this fact and does not believe that the testimony supports this proposition. It concedes, however, that the testimony does discuss the preliminary idea of the Oz Group buying out KWWI if the sale went

through. Making all reasonable inferences in favor of KWWI and WTI on this motion for summary judgment, the court believes it is reasonable for KWWI and WTI to argue that they believed the FUA would be bought out.

leaving the SFAAP until he received the termination notice on March 29, 2001.

KWWI filed a lawsuit against Alliant for breach of the FUA in Johnson County District Court in February of 2000. KWWI objected to the removal of railroad lines at the SFAAP. The petition referenced the Army's decision to excess the SFAAP, the Government's negotiations with the Oz Group to sell the SFAAP, and the fact that the Government and Alliant would be required to terminate all contractual leases at the SFAAP. The claims, however, related solely to the issue of whether Alliant wrongly removed railroad lines at the SFAAP. The lawsuit was dismissed with prejudice in June of 2000.

On March 29, 2001, Alliant informed KWWI and WTI by letter, dated March 27, 2001, that the Army had invoked the termination provisions and was requiring KWWI and WTI to vacate the facility on or before September 30, 2001. The letter represented that the Government "ask[ed] Alliant to proceed with a 180–day notice to tenants to vacate the facility at the end of Alliant's contract at Sunflower Army Ammunition Plant."[4] In May of 2001, the Government offered KWWI and WTI a one-year license to stay at the SFAAP that could be terminated on 30 days notice. The lease was conditioned on an agreement by KWWI and WTI to "refrain from

bringing legal actions against either Alliant or the Army." KWWI and WTI declined the offer.

The Oz theme park never came to fruition. In March of 2001, the Johnson County Commission refused to approve the project. Then, in October of that year the Johnson County Commission voted to forego any further consideration of the project.

KWWI and WTI filed the instant lawsuit on December 5, 2002. The complaint includes claims for breach of contract (Count I), promissory estoppel (Count II), fraud (Count III), fraud through silence (Count IV), and negligent misrepresentation (Count V).

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."

---

**4.** KWWI and WTI contend that Alliant asked the Army to invoke the 180–day clause after Alliant made a business decision that it was not "in its best interests" to renew the expiring Facilities Contract. In fact, KWWI and WTI point out that Alliant informed the Army that it was not renewing the Facilities Contract and that it could be "troublesome" to terminate existing tenants' FUAs. According to KWWI and WTI's theory, the Army then invoked the termination clause in an attempt to help Alliant extricate itself from the various FUAs it had with SFAAP tenants. The Army invoked the termination clause on March 26, 2001. In the March 27, 2001 letter Alliant sent to KWWI, Alliant represented that the

Government unilaterally terminated the Government contract, and that its termination was beyond Alliant's control. KWWI and WTI believe this characterization is misleading. They point to a statement by the Government on June 15, 2001 reiterating the fact that it "did not terminate [Alliant's] facility use contract, [Alliant] chose to leave [the SFAAP] at the end of Sep 2001 thus allowing the facility use contract to expire." The testimony regarding this issue is hotly disputed. Alliant also disputes KWWI and WTI's characterization of the facts. However, because these facts impact the underlying fraud claim, not the statute of limitations issue, the court will not address this dispute here.

*Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.,* 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City*

*of Moore, Oklahoma,* 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Statute of Limitations

Alliant argues that KWWI's and WTI's fraud claim (Count III), fraud through silence claim (Count IV), and negligent misrepresentation claim (Count V) should be dismissed with prejudice because such claims were not brought within the applicable statute of limitations.

 The statute of limitations on a fraud claim in Kansas is two years. K.S.A. § 60–513(a)(3). The limitations period is also two years on a negligent misrepresentation claim. K.S.A. § 60–513(a)(4). But, the statute of limitations is not triggered until the claim has accrued. *Bryson v. Wichita State Univ.,* 19 Kan.App.2d 1104, 1107, 880 P.2d 800 (1994). A claim in a fraud lawsuit accrues at the later of: (1) the time of the negligent/fraudulent act; (2) when the plaintiff suffers substantial injury (that is reasonably ascertainable); or (3) when the plaintiff discovers, or should have discovered, the essential material facts of the fraud. *Id.* In other words, a plaintiff in a fraud lawsuit must file his or her action within two years of discovering the fraud if he or she suffered an ascertainable injury at that time. *Id.* If not, the plaintiff must file suit within two years of when substantial injury resulting

from the fraud is reasonably ascertainable (not to exceed ten years). *Id.*

■■■ When the plaintiff should have discovered the fraud and when the plaintiff suffered a substantial injury that is reasonably ascertainable are questions of fact. *Id.* at 1108–09, 880 P.2d 800. Thus, where the evidence is in dispute as to when the fraud should have been discovered, when substantial injury first occurred, or when that injury became reasonably ascertainable, the trier of fact decides the issues. *Id.*

In this action, KWWI and WTI filed their lawsuit on December 5, 2002. They argue that they could not have discovered the alleged fraud until Alliant informed them on March 29, 2001 that the FUA was being terminated. Alternatively, they argue that they did not suffer a substantial injury that was ascertainable until that date. Alliant, on the other hand, argues that KWWI and WTI should have discovered the alleged fraud well before December 5, 2000.

**A. Discovery of the Alleged Fraud**

KWWI and WTI allege that Alliant induced them to enter into the FUA, a long-term contract, and to invest a significant amount of money and assets in the SFAAP at a time when Alliant never intended to perform its obligations under the FUA. More specifically, the complaint alleges that Alliant misrepresented the terms under which Alliant's contract with the Army might be terminated[5], it misrepresented that it intended to stay at the SFAAP "for a long time," it failed to reveal the terms of its contract with the Army, and it failed

to disclose rumors that the government might excess the SFAAP.

Alliant contends that KWWI and WTI should have discovered this alleged fraud prior to December 5, 2000. Specifically, Alliant contends that KWWI and WTI knew by 1999 at the latest that Alliant's contract was expiring and the proposed sale of the SFAAP to the Oz Group would likely require KWWI to leave the plant. In particular, Alliant points out that the Government announced in 1997 that it would "excess" the SFAAP. Then, by 1998 it was public knowledge that the Government was in negotiations with the Oz Group to sell the SFAAP. In fact, Alliant points to KWWI's February 17, 2000 petition filed against Alliant for breach of contract which references the Government's decision to "excess" the SFAAP and attempt to "terminate" all contractual leases at the SFAAP. And although the sale to the Oz Group never occurred, Alliant points out that in July of 1999 it announced that its contract with the Government expired in March of 2000. According to Alliant, these disclosures should have been sufficient to expose Alliant's alleged fraud well before December 5, 2000.

■■■ On the other hand, KWWI and WTI argue that part of the fraud relates to the termination provisions (which could not have been exposed until the actual termination) and that during the term of the FUA, Alliant "lulled" them into a false sense of security by repeatedly assuring them that the FUA would be honored either through performance or a lucrative buy-out. They also contend that Alliant asked the Government to improperly ter-

---

**5.** The parties differ drastically on the events surrounding the consummation of the FUA. One of the disputes involves the termination provisions of the FUA. On this motion for summary judgment pertaining to the statute of limitations, it is sufficient to state that KWWI and WTI believed that Alliant induced

them into the contract by assuring them that the Government could only terminate their contract for "just cause." According to KWWI and WTI, Alliant informed them that "just cause" was limited to a national emergency or some other unlikely event.

minate both the Government's Facilities Contract and the FUA.[6] In other words, as alleged in the complaint, "Alliant engaged in an ongoing scheme to cover up its false representations and fraudulent conduct." Thus, KWWI and WTI contend that, because they could not have had knowledge of Alliant's fraud and negligent misrepresentations until Alliant announced on March 29, 2001 that the FUA was being terminated, summary judgment should be denied. At a minimum, they argue, the evidence submitted by KWWI and WTI creates a genuine issue of material fact as to when Alliant's fraud should have been discovered. The court agrees that there are genuine issues of material fact regarding when the fraud was or should have been discovered. Thus, the motion for summary judgment is denied.

█ The statute of limitations for fraud is triggered when the injured party has actual knowledge of the fraud or when the fraud could have been discovered with reasonable diligence. *Augusta Bank & Trust v. Broomfield,* 231 Kan. 52, 62–63, 643 P.2d 100 (1982); *Wolf v. Brungardt,* 215 Kan. 272, 524 P.2d 726 (1974). Mere suspicion of wrong is not sufficient. *Id.* Further, the Kansas Supreme Court has explained that while a party's suspicions may have been aroused, that party "may be lulled into confidence by certain representations and forego any further investigation." *Broomfield,* 231 Kan. at 63, 643 P.2d 100 (citation

omitted); *see also Wolf,* 215 Kan. at 281–82, 524 P.2d 726.

█ In this action, KWWI and WTI do not dispute that they were aware that the Government made a preliminary decision to "excess" the SFAAP in 1997. They also concede they were aware the Government was interested in selling the SFAAP to the Oz Group in 1998. They contend, however, that Alliant repeatedly reassured them that neither the FUA nor their future at the SFAAP would be affected by either event and that business would continue "as usual." Further, KWWI and WTI contend that Alliant's representatives stated that while Oz would not permit KWWI or WTI to continue to operate, Oz would buy out the FUA. Based on these representations, KWWI and WTI concede they were on notice that Alliant might make the business decision of breaching the FUA; however, they contend they had no reason to believe that Alliant was engaged in an ongoing scheme to conceal their fraud and negligent misrepresentations. Moreover, they argue that Alliant furthered the fraud by asking the Government to terminate the Facilities Contract and FUA without a legitimate basis to do so. In reply, Alliant argues that the facts needed to establish "continuing fraud" are not set out in the complaint and that the uncontroverted facts demonstrate that KWWI and WTI have no evidence to support their allegations that Alliant concealed any alleged fraud.[7] Thus, the court turns to the par-

---

6. Alliant contends that this allegation is not in the complaint. However, paragraph 86 of the complaint alleges that Alliant asked the Army to invoke the termination provision of the Facilities Contract, and paragraph 87 alleges that the Army did invoke the provision at Alliant's request.

7. At several points in its reply brief, Alliant accuses KWWI and WTI of altering their fraud claims and arguing that KWWI and WTI's new characterization and evidence fail to support a fraud claim. Alliant, however,

did not raise these arguments until its reply brief. Generally, a party is prohibited from raising new arguments and issues in a reply brief, *Boilermaker–Blacksmith Nat. Pension Fund v. Gendron,* 67 F.Supp.2d 1250, 1257 n. 4 (D.Kan.1999), and a court should not consider issues first raised in a reply brief, *Plotner v. AT & T Corp.,* 224 F.3d 1161, 1175 (10th Cir.2000). Thus, the court disregarded those arguments. Of course, Alliant is free to file a summary judgment motion on the merits of the claims.

ticular evidence KWWI and WTI have presented to support their theory of continuing fraud.

With regard to the decision to excess the SFAAP, KWWI and WTI concede they learned of the Government's decision to excess in a November 6, 1997 letter from Gayla Frazier. They point out, however, that Ms. Frazier expressly stated in the letter. "There is a possibility, as this process progresses, the Army could decide not to excess Sunflower." They also contend that Ms. Frazier's letter instructed KWWI and WTI that the Government's categorization of the SFAAP as "excess" would not impact the FUA and that business should continue "as usual." Mr. McNally also contends that Alliant made similar representations assuring KWWI and WTI that their agreement and operations at the SFAAP were neither jeopardized nor impacted by the Government's decision to excess the SFAAP. In particular, Ms. Frazier told Mr. McNally "not to worry about it," and "we have been down this road before," and that Alliant was actively seeking new tenants for the SFAAP despite the Government's decision. Alliant later told Mr. McNally that its "mission was one of ongoing tenant support."

With regard to the Oz project, KWWI and WTI concede that they learned of a proposed sale of the SFAAP to the Oz Group. In fact, Alliant notified KWWI by letter, dated July 19, 1999, that the Government was negotiating the possible sale of the SFAAP to the State of Kansas, which, in turn, would sell the SFAAP to the Oz Group. In that same letter, however, Alliant stated that there was no guarantee that the sale would happen. Moreover, Alliant assured KWWI and WTI that, if the sale did go through, KWWI and WTI's FUA would be honored through performance or a lucrative buy-out. On June 13, 2000, Ms. Frazier informed Mr. McNally that "there is no assurance that

the [Oz] conveyance agreement will be accepted or rejected," and that the pendency of the Oz project "does not change the agreement currently in place between Alliant and KWWI." In short, Alliant argues that the evidence establishes that at no time during the negotiations was it clear that the Oz project was going to be consummated. Moreover, KWWI and WTI point out that in March of 2001 the Johnson County Commission refused to approve the Oz project and then in October of 2001 voted to forego any further consideration of the Oz project.

In further support that it was public knowledge that the Government was attempting to sell the SFAAP to the Oz Group, Alliant points to two district court opinions from this District stating that the Army decided that the SFAAP was excess to its needs, was available as surplus to the needs of the United States, and that the Government was attempting to dispose of the property. KWWI and WTI do not dispute that this evidence was publicly available. Instead, as noted above, they point out that privately Alliant was reassuring them that neither the excess decision nor the proposed sale of the SFAAP would affect or injure them. They contend that it never occurred to them that Alliant had fraudulently induced them to enter into the FUA and was actively concealing its fraud and negligent misrepresentations with further deception.

With regard to the previous lawsuit by KWWI against Alliant, KWWI points out that the lawsuit did not involve issues similar to the ones involved in this action. The February 17, 2000 petition sought to prevent Alliant from removing certain railroad lines that KWWI and WTI used as part of their operations at the SFAAP. Alliant was going to remove the railroad lines that were adjacent to the plant and KWWI felt this breached the parties' con-

tract. The petition, Alliant argues, was limited solely to the improper removal of the railroad tracks and did not relate to any of the issues that form the basis of the current action. While Alliant highlights a portion of the petition that states that in 1997 the government began negotiating with the Oz Group to sell the SFAAP, that such a sale would require Alliant to terminate all contractual leases it had at the SFAAP, and that the Government placed the SFAAP on "excess" status, KWWI and WTI argue that such allegations did not put them on notice of Alliant's fraud. In fact, as noted above, Alliant's comments to KWWI and WTI reassured KWWI and WTI that the FUA would be honored.

Alliant also contends that a draft document relating to the planned sale of the SFAAP should have alerted KWWI and WTI of the alleged fraud. It stated that "the Army shall address KWWI activities at Sunflower by terminating or causing to be terminated: the KWWI FUA." Alliant points out that Mr. McNally conceded that he saw this document at some point in 1999. KWWI and WTI argue, however, that this document does not support Alliant's argument. KWWI and WTI do not dispute that if the SFAAP was sold, they understood that Alliant might be forced to buy them out of the FUA to avoid a breach of contract action. However, KWWI and WTI contend the document did not inform them that Alliant had fraudulently induced them to enter into the contract and then continued to hide its fraud by reassuring KWWI and WTI that the Oz project would not go through or, in the event that it did occur, by telling them that their FUA would be bought out.

In sum, viewing the evidence in the light most favorable to KWWI and WTI, the nonmoving parties, and drawing all reasonable inferences in their favor, the court concludes that there are genuine issues of material fact as to whether KWWI and WTI should have discovered Alliant's alleged fraud. On the one hand, Alliant has pointed to numerous public documents and other information that could have put KWWI and WTI on notice that Alliant's representations regarding the SFAAP may not have been accurate. In particular, KWWI and WTI allege that Alliant induced KWWI and WTI to enter into the FUA when it knew that it never intended to perform its obligations under the FUA. The fraud, according to KWWI and WTI, relates to the 15 year lease with two five year options, Alliant's ability to perform its obligations for the term as written, and the terms and conditions governing the early termination of the agreement. It is possible that the decision to excess the FUA, the proposed sale to Oz, and Alliant's announcement in July of 1999 that it was leaving the SFAAP could have led KWWI and WTI to discover Alliant's alleged fraud.

On the other hand, Alliant has pointed to multiple statements by Alliant representatives from which it could be inferred that Alliant lulled KWWI and WTI into believing that the FUA would be honored either through performance or a buy-out. For example, after the decision to excess the SFAAP and the Government's attempt to dispose of the SFAAP, Alliant's representatives informed KWWI and WTI that these decisions did not impact the current operations and that if the Oz Group purchased the SFAAP, it would buy out KWWI and WTI's contract. Similarly, although Alliant informed KWWI and WTI in July of 1999 that it was leaving the SFAAP, it subsequently obtained three six-month extensions and then did not inform KWWI and WTI that it was leaving until March 29, 2001. Also, Alliant told KWWI and WTI that another facility use operator would take over the FUA. Thus, there is evidence from which a fact finder could conclude that Alliant lulled KWWI

and WTI into believing that the terms of the FUA would be honored, thereby concealing its alleged fraud until KWWI and WTI were notified on March 29, 2001 that the FUA would be terminated. As a result, the court concludes that genuine issues of material fact exist as to whether the alleged fraud could have been discovered, and summary judgment is therefore denied. The trier of fact must decide this issue based on the evidence submitted at trial.

### B. Substantial Injury

KWWI and WTI make the additional argument that they did not sustain a substantial injury until Alliant wrongfully terminated the FUA. Fraud and negligent misrepresentation claims such as these do not accrue until the act giving rise to the claim first causes "substantial injury," or, if the fact of injury is not reasonably ascertainable until some time after the initial act, at the time when the fact of injury becomes "reasonably ascertainable" to the injured party. K.S.A. § 60–513(b). Because the court has concluded that there are genuine issues of material fact regarding when the alleged fraud should have been discovered, the court need not reach this issue of fact. It is sufficient to say that the evidence in the record at this time is in dispute as to when KWWI and WTI suffered a substantial injury and when that injury was reasonably ascertainable. If the trier of fact determines the alleged fraud should have been discovered prior to December 5, 2000, then it must also determine whether KWWI and WTI suffered a substantial injury at that time or whether such injury occurred at a later date.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant Alliant's motion for summary judgment on fraud and misrepresentation counts (Doc. 9) is denied. In short, there are genuine issues of material fact as to whether KWWI and WTI should have discovered Alliant's alleged fraud and whether KWWI and WTI suffered a reasonably ascertainable injury prior to the statute of limitations period—December 5, 2000.